

# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
01/19/2016

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 15-34287 (MI)** |
| | § | |
| | § | |
| **BLACK ELK ENERGY OFFSHORE** | § | **(Chapter 11)** |
| **OPERATIONS, LLC** | § | |
| | § | |
| **Debtor** | § | |
| | § | |

## ORDER AUTHORIZING CONTINUED USE OF
## CASH COLLATERAL AND APPROVING OF STIPULATION

This matter came before the Court on the *Amended Emergency Motion for Authority to Use Cash Collateral* (the "Motion"), pursuant to Section 363(c)(2) of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001(b)(1) of the Federal Rule of Bankruptcy Procedure 4001(b)(1) (the "Bankruptcy Rules"), filed by Black Elk Energy Offshore Operations, LLC (the "Debtor" or "Black Elk"), the debtor-in-possession in the above-referenced chapter 11 case. Black Elk seeks an order (i) authorizing the Debtor to enter into the Financial Accommodation by approving the Stipulation; and (ii) authorizing the Debtor to use the proceeds of the Financial Accommodation in accordance with the Debtor's current cash collateral budget [Dkt. No. 561] through February 10, 2016.[1] The Court, having reviewed the Motion, together with the record in this case, and finding that the Motion was timely served on all interested parties and that the Financial Accommodation is fair and reasonable, and otherwise duly advised in the premises it is **ORDERED AND ADJUDGED** as follows:

    1.     The Debtor is hereby authorized to enter into the Financial Accommodation as set forth in the Stipulation.

---

[1] All capitalized terms not defined herein are ascribed the meanings as stated in the Motion.

2.      The Debtor is hereby authorized to use the proceeds of the Financial Accommodation in accordance with the Debtor's current cash collateral budget, attached hereto as Exhibit A, through February 10, 2016, and to pay amounts required by the Order Granting Adequate Protection entered on this date.

3.      Merit shall cause its surety to issue the replacement bonds for Ace bond number KO8025058 in the penal sum of $9,579,000 and to file the Merit Replacement Bond with BOEM as soon as is practical. The Merit Replacement Bond shall notate a checkmark on the box stating "All Obligations of all previous sureties or guarantors even if the Obligations are not Obligations of the Principal during the period of liability on this bond," thereby allowing BOEM to issue cancellation letters with a "no residual liability" acknowledgement.  Nothing in this Stipulation shall be construed as waiving or limiting BOEM's or the Department of the Interior's rights to pursue a remedy against any surety in the event of fraud by the surety.

4.      BOEM's final approval of the Merit Replacement Bond and its agreement not to call the Merit Replacement Bond to cover liabilities not specifically covered by the Merit Replacement Bond is subject to the following conditions: (i) BOEM's final review of the actual bonds being submitted; (ii) the Merit Replacement Bond will not be canceled or released until all decommissioning work subject to the bond is completed as determined by Interior; (iii) the Merit Replacement Bond will cover not only P&A obligations, but also all non P&A obligations covered by Lease OCS 00541 - E/2 of Block 160 including, without limitation, ONRR's royalty obligations; (iv) Merit agrees to complete or pay a third party to have completed for it, all of the P&A which Merit is required to perform under Lease OCS 00541-E2 of Block 160  regardless of the penal amount of the bonds as between BOEM and Merit without prejudice to Merit's rights against third parties, including the Debtor, to recover such costs; and (v) both Ace and Travelers will remain liable for any fraud.

5.     Upon approval by BOEM of the Merit Replacement Bond on Ace bond number KO8025058, (i) Ace will release $9,579,000 as follows: (i) $7,579,000 to Merit to partially collateralize the Merit Replacement Bond; and $2,000,000 to the Debtor (the "Operating Funds"). The Operating Funds shall be immediately available to the Debtor as additional operating funds to be used pursuant to the budget and further cash collateral order.

6.     No party shall impair or take an action to impair the replacement liens and superpriority administrative claim of Merit in the Merit Replacement Collateral, the Future Released Bonds, or the Merit Replacement Bonds.

7.     Except as provided in paragraph 10, the Merit Replacement Collateral shall be transferred by Merit to the Black Elk-Merit Escrow Account created under that certain Escrow Agreement between the Debtor and Merit on or about May 31, 2011 free and clear of any liens and claims except for the Debtor's reversionary rights under the Escrow Agreement (and transaction agreements related thereto) and parties' associated reservations related to such reversionary rights. The Debtor hereby stipulates, and the Court hereby finds, that Merit has a valid, perfected, first-priority lien in the Black Elk-Merit Escrow Account, and that the Black Elk-Merit Escrow Account shall be solely used for the purposes set forth in the Merit PSA, DACA Merit Escrow, and 2015 P&A Agreement, both as determined by the Court in the 9019 Order [Dkt. No. 368]. The Merit Escrow Account shall be solely used for the purposes set forth in the Merit PSA, DACA Merit Escrow, and 2015 P&A Agreement absent the express written consent of Merit.

8.     The Debtor shall pay all premiums due on the Merit Replacement Bonds within 30 days of receipt of invoices for such premiums.

9.     As set forth in the Stipulation, Merit's obligations are conditioned upon Ace and TKN Petroleum, LLC, consenting to the relief sought herein. Merit may waive this condition in its discretion. Merit's obligations are also conditioned upon BOEM agreeing that it will not call

the Merit Replacement Bond to cover liabilities of the Debtor which are not specifically secured by the Merit Replacement Bond.

10.     To the extent the actual P&A cost of completion of all plugging and decommissioning obligations of Debtor with respect to East Cam 160 are less than $6,639,000, the difference shall be returned to the Debtor, less (i) the amount of any bond premiums not paid by the Debtor on the Future Released Bonds or the Merit Replacement Bonds, as provided for and defined in both the 9019 Order and the Stipulation, and (ii) any other amounts that are obligations (such as royalty payments) of Debtor that are required to be paid by Merit to cause the release of the Future Released Bonds, as provided for and defined in both the 9019 Order and the Stipulation, by Merit from the Black Elk-Merit Escrow Account (the "Subsequent Released Funds"). The Subsequent Released Funds will not be used absent further court order. TKN reserves all arguments and rights regarding its claimed ownership to such Subsequent Released Funds.

11.     Upon the cancellation, termination of the period of liability, or other release by BOEM of Ace bond number KO8025058, Ace shall wire the $9,579,000 as soon as is reasonably practical after the Merit Replacement Bond is issued to the Debtor and Merit in the amounts provided under this Order. To the extent that all actions precedent to the release of funds by Ace have been taken (as determined by Merit and Ace each in their individual and sole discretion) and Ace is not able to release the Operating Funds to the Debtor by January 20, 2016, Merit shall advance $2,000,000 to the Debtor from the Black Elk-Merit Escrow Account. Such advance shall be repaid to Merit by Ace releasing the full $9,579,000 to Merit, rather than Ace releasing the $2,000,000 in Operating Funds to the Debtor, as soon as is reasonably practical after cancelation, termination of the period of liability, or other release by BOEM of Ace bond number KO8025058.

12.     Notwithstanding any other provisions of this Order, nothing in this Order or the annexed cash collateral budget is intended to impact or permit the Debtor to violate 28 U.S.C §959(b) or limit, or affect, in any way the rights of the Department of the Interior ("Interior") with respect to the Debtor's decommissioning obligations, including the Debtor's bonding obligations (collectively, the "Decommissioning Obligations"), associated with the Debtor's interest in all of its active and inactive federal oil and gas leases or pipeline rights-of-way on the Outer Continental Shelf. Nothing in this Order, or the amounts set forth in the Debtor's interim or final cash collateral budgets, are intended to pre-determine, limit or affect, in any way, the Debtor's Decommissioning Obligations.

13.     This Order, the Financial Accommodation, and the Term Sheet do not ratify the TKN Sale Agreement or otherwise waive the rights of the Debtor, creditors, or any other parties in interest (including the Ad Hoc Noteholders, the Indenture Trustee, the Committee, W&T Offshore, McMoRan, or Merit) to assert claims or causes of action against TKN or PPVA and any of their respective affiliates, current or former officers, partners, directors, members, employees, or agents who were in any way related to the TKN Sale Agreement (collectively, the "TKN Parties" or the "PPVA Parties" as appropriate) and/or the transaction set forth in the TKN Sale Agreement and/or any other transaction or transfer involving TKN. The TKN Parties  and PPVA Parties reserve all rights and defenses related to the preceding reservation.

Dated: January 19, 2016

_____
Marvin Isgur
United States Bankruptcy Judge

# Black Elk Energy
## Cash Flow Projection

GLOBAL NOTE TO BUDGET: These projections have been prepared solely for the purposes of the Debtor's Motion for Entry of DIP Order and are based exclusively on information provided by the Debtor. There is a need for continuing due diligence which may result in material deviations from these projections. The associated footnotes on the following page are integrated into the budget and should be read in conjunction therewith.

| NOTES | | Projected Week 18 | Projected Week 19 | Projected Week 20 | Projected Week 21 |
|---|---|---|---|---|---|
| | Starting: | 1/18/2016 | 1/25/2016 | 2/1/2016 | 2/8/2016 |
| | Ending: | 1/24/2016 | 1/31/2016 | 2/7/2016 | 2/14/2016 |
| | **Operating Cash Receipts** | | | | |
| 1 | Operating Receipts | - | - | - | - |
| 1 | Non-Operating Receipts | 72,433 | - | - | - |
| | Service Receipts | - | - | - | - |
| 2 | JIB Receipts | - | 18,773 | 19,666 | 5,540 |
| | Other non-recurring proceeds | - | - | - | - |
| | Other Receipts | - | - | - | - |
| | **Total Receipts, Gross** | 72,433 | 18,773 | 19,666 | 5,540 |
| | Royalties & Severance Taxes Paid | (31,840) | - | - | - |
| | **Total Operating Receipts, Net** | 40,593 | 18,773 | 19,666 | 5,540 |
| 3 | Lease Operating Expenses- Non-production related | (15,000) | (29,500) | (24,927) | (15,000) |
| | Lease Operating Expenses- Maintenance | (2,500) | (22,500) | (2,500) | (2,500) |
| 4 | Lease Operating Expenses- HSE & C | (77,800) | (85,300) | (87,487) | (77,800) |
| | Lease Operating Expenses- Production related | - | - | - | - |
| 5 | JIB Disbursements | - | - | - | - |
| | **Direct Operating Disbursements** | (95,300) | (137,300) | (114,915) | (95,300) |
| | Salary Payroll | (35,596) | - | (35,596) | - |
| | Payroll Tax | (12,815) | - | (12,815) | - |
| | Payroll Fee | - | (315) | - | - |
| | Benefits Expense | - | - | 6,500 | (21,470) |
| | Workman's Compensation | - | - | - | (1,068) |
| | 401K Expense | - | - | - | - |
| 6 | Other Payroll | - | (332,000) | (100,000) | - |
| | Reimbursable Employee Expenses | (1,068) | - | (1,068) | - |
| | **Payroll Related Expenses** | (49,478) | (332,315) | (142,978) | (22,538) |
| | Rent and Leases | - | - | (11,008) | - |
| | Utilities | - | - | - | - |
| 7 | Insurance | - | - | - | - |
| 8 | Surety bond premiums | (36,472) | (11,750) | (7,050) | - |
| | IT & Systems | - | (8,364) | (1,100) | - |
| | Independent Director's Fees | - | - | (35,000) | - |
| | Other G&A | (3,787) | (44,563) | (3,100) | (3,000) |
| | General and Administrative | (89,737) | (396,992) | (200,236) | (25,538) |
| | **Total Operating Disbursements** | (185,037) | (534,292) | (315,151) | (120,838) |
| | **OPERATING CASH FLOW** | (144,444) | (515,519) | (295,485) | (115,298) |
| 9 | **Surety bond proceeds** | - | - | - | - |
| 10 | **Other Non- Operating Proceeds** | 2,000,000 | - | - | - |
| 11 | Debtor Professional Fees | (425,000) | - | (175,000) | - |
| | UCC Professional Fees | (100,000) | - | (50,000) | - |
| | Indenture Trustee Professional Fees | - | - | - | - |
| | Ad Hoc Professional Fees | 0 | - | - | - |
| | U.S. Trustee Professional Fees | (4,875) | - | - | - |
| | Required Deposits | - | - | - | - |
| | **Total Misc. Disbursements** | (529,875) | - | (225,000) | - |
| 12 | **Accrued Unpaid Expenses** | (20,348) | - | - | - |
| | **P&A Contractor Contingency** | - | 0 | - | - |
| | Principal Payments | - | - | - | - |
| | Interest Payments & Fees | - | - | - | - |
| | **Total Debt Service Expenses** | - | - | - | - |
| | **NET CASH FLOW** | 1,305,332 | (515,519) | (520,485) | (115,298) |
| | Beginning Cash Balance | 519,403 | 1,824,735 | 1,309,217 | 788,732 |
| | Net Cash Flow | 1,305,332 | (515,519) | (520,485) | (115,298) |
| | Ending Cash Balance | 1,824,735 | 1,309,217 | 788,732 | 673,434 |
| | Week Ending: | 1/24/2016 | 1/31/2016 | 2/7/2016 | 2/14/2016 |

CONFIDENTIAL

Exhibit "A"

Incorporated Notes to Budget:

1. Oil and Gas Receipts: The Debtor was recently informed that BSEE had removed the shut in order and is contemplating the economic benefit to produce or not to produce. The last operating receipts were received week of 9.21.

2. JIB Receipts: Based on analysis of historical data which is unreliable. JIB receipts are difficult to estimate as it tends to be up to the partners' discretion when and if these are paid.

3. LOE- Non-Production Related: Vendors included in this analysis are those provided by the Debtor's management to date.

4. Lease Operating Expenses- HSE & C: Consists primarily of Island Operating's pollution matrix inspections at ~$78k per week. Pending BSEE approval , the Debtor intends to deinventory a number of platforms which could reduce Island's cost by ~40%. The deinventory process is expected to take 40-60 days and cost the debtor ~$250-300k. As the project cost will be offset through the reduction of Island's expense and completed near the end of this projection period, net cost reductions will begin to accrue to the Debtor in early 2016.

5. JIB Disbursements: The Debtor is evaluating payment of joint interest billings on an as required basis. Currently, there are no JIB disbursements being made.

6. Other Payroll: Includes costs for support staff from an independent accounting firm as well as SEMs management and regulatory personnel to support the Company after certain employee terminations.

7. Insurance: Relates primarily to insurance for Black Elk and TKN properties, ~$50k and $83k, respectively. The Debtor is actively reviewing its insurance needs.

8. Surety Bond Premiums: Pending confirmation from the Debtor's bonding agent regarding timing of premium payments.

9. Surety Bond Proceeds: A. Release of funds associated with the 9019 Order.
                                              B. Subject to cash collateral order.

10. Other Non-Operating Proceeds: Relates to the $2.0m for the release of Merit escrow funds.

11. Debtor Professional Fees: Includes fees for the Debtor's CRO and Financial Advisor, Blackhill Partners, for $175k per month plus ~$20k per month for expenses. The remainder includes fees for legal counsel to the Debtor, and will be subject to a future procedures order and fee applications. The increase in legal fees take into consideration the need for additional resources as the case progresses.

12. Accrued Unpaid Expenses: Represents fees payable under the compensation procedures order, including prior period earned fees as well as the applicable hold backs under the order.