**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **BLACK ELK OFFSHORE** | § | **Case No. 15-34287 (MI)** |
| **OPERATIONS, LLC,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |

**UNITED STATES' OBJECTION AND RESERVATION OF RIGHTS WITH RESPECT TO THE DEBTOR'S EMERGENCY MOTION FOR ENTRY OF A FINAL ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING AND TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, AND (III) GRANTING RELATED RELIEF**

[*Relates to Docket No. 691*]

The United States, on behalf of the United States Department of the Interior ("Interior"), hereby files this objection and reservation of rights (the "Objection") with respect to: the Debtor's Emergency Motion for Entry of a Final Order: (I) Authorizing the Debtor to Obtain Postpetition Financing and to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Related Relief (Docket No. 691) (the "Motion"), which attaches a proposed final debtor-in-possession financing order (the "Proposed DIP Order")[1], a concise Statement of Terms (the "Term Sheet") and a Senior Secured Superpriority Debtor-In-Possession Credit Agreement (the "DIP Credit Agreement"; collectively with the Proposed DIP Order and the Term Sheet, the "DIP Facility"), and in support of its Objection, respectfully states as follows:

**PRELIMINARY STATEMENT**

1.       The United States supports completing as much decommissioning as possible in

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings attributed to them in the Proposed DIP Order or the Motion, as applicable.

chapter 11.  Similarly, the United States would not object to DIP financing that is reasonable, necessary and adequate which would enable the Debtor to satisfy the maximum amount of its decommissioning obligations pursuant to <u>Midlantic National Bank v. New Jersey Department of Environmental Protection</u>, 474 U.S. 494, 106 S. Ct. 755 (1986) ("<u>Midlantic</u>") and its progeny.

2.      The proposed DIP Facility, and specifically several Objectionable Terms (defined below) within it, however, are either unreasonable or unneceessary, and would not allow the Debtor to meet the maximum amount of its environmental obligations required under <u>Midlantic</u>.

3.      Among other things, the proposed DIP Facility would advance $15 million in superpriority administrative expense claims ahead of the administrative claims for the balance of the Debtor's decommissioning obligations owing to the United States that are currently excluded from the Montco P&A Plan (the "<u>Excluded P&A Claim</u>"), in exchange for a relatively small $7.5 million in new post-petition financing.

4.      The Debtor has advised the United States that it will not ask the United States to waive its Excluded P&A Claim or any other allowable administrative expense claim that the United States may have against the estate.  However, it has also represented that it will not be able to pay the United States' administrative claims in full on the effective date of a chapter 11 plan as required by 11 U.S.C. § 1129(a)(9).  Instead, the Debtor will seek to negotiate with the United States on the proposed treatment of its Excluded P&A Claim and other administrative claims that the United States may have in connection with the liquidating trust to be established under a chapter 11 plan.

5.      Accordingly, the United States supports the suggestion made by this Court at the hearing on March 1, 2016 that the Debtor seek a form of bridge financing that would enable it to present its chapter 11 plan at the same time that any proposed DIP financing is considered on

a final basis.  In that way, the United States can determine how the Debtor proposes to treat the United States' Excluded P&A Claim, other administrative expense claims and general unsecured claims under a chapter 11 plan, thereby enabling it to decide whether it makes sense to saddle the estate with $15 million dollars' worth of superpriority administrative expense claims.

6.      Moreover, the United States submits that the proposed DIP financing is unreasonable and unnecessary to the extent that it seeks a 2-for-1 roll up for the Noteholder DIP Lenders, which is disproportional to the amount of new money being extended by the Noteholder DIP Lenders under 11 U.S.C. §364(d).

7.      This disproportional value grab is in addition to numerous other seemingly overreaching provisions in the DIP Facility including: (1) granting the Noteholder DIP Lenders liens on recoveries on the Insider Causes of Action, which is likely to be the single largest source of unencumbered recovery which, otherwise, can satisfy the Debtor's remaining decommissioning obligations and other claims, (2) a roll-up of the $500,000 being extended to fund the investigation of the Insider Causes of Action, which essentially gives the Noteholder DIP Lenders at least a $1 million dollar recovery before a cent can be used to satisfy the balance of the Debtor's decommissioning obligations or other claims, (3) encumbering any remaining unencumbered asset of the estate including the Northstar Recovery, and (4) giving the DIP Lenders *de facto* veto power over any chapter 11 plan to be proposed by the Debtor.

8.      To the extent that this Court is inclined to approve the proposed DIP Facility, the United States requests that any roll-up be disallowed given the limited unencumbered assets available to the Debtor to meet its unavoidable environmental obligations or, at a minimum, that any roll-up be permitted only on a proportional dollar-for-dollar basis in exchange for new post-

petition financing extended to the Debtor.  The United States further requests that the Court reserve the right to unwind any roll-up to the extent that it is later determined that the noteholders do not have a valid springing lien on the Northstar Recovery from which the 2-for-1 roll-up will be repaid.

9.      Moreover, any lien on chapter 5 causes of action is improper and should be denied.  The recovery from any chapter 5 causes of action should be allocated to the Debtor's remaining environmental obligations before being used to meet the Debtor's general unsecured claims because the Debtor cannot abandon the properties subject to decommissioning under Midlantic.  Moreover, administrative expense claims are conferred with a greater priority of distribution under 11 U.S.C. §507(a)(2).

10.     If the proposed DIP Facility is approved without resolving the United States' concerns regarding its Excluded P&A Claim, the United States might well fare better in a liquidation under chapter 7 without the liens and superpriority clams imposed by the proposed DIP Facility.

11.     Thus, unless the terms of the proposed DIP Facility can be rationalized as requested herein, this Court should deny the Motion.

**<u>BACKGROUND</u>**

12.     The Debtor is an oil and gas company that holds interests in numerous leases and rights-of-way (each, a "<u>ROW</u>"; together with the federal leases, the "<u>Leases</u>") on the Outer Continental Shelf (the "<u>OCS</u>") and serves as the designated operator for numerous Leases on the OCS.

13.     On August 11, 2015 (the "<u>Petition Date</u>"), three (3) petitioning creditors filed an involuntary chapter 7 petition (Docket No. 1) against the Debtor.

14.     On August 17, 2015 and August 19, 2015, BSEE issued a Shut In Incidence of Non-Compliance (the "Shut In INC") to the Debtor for its failure to develop, implement and maintain a safety and environmental management systems ("SEMS") program.  The Shut In INC did not relieve the Debtor of its obligations to perform decommissioning.

15.     On September 1, 2015, this Court entered an Order for Relief (Docket No. 74) and also entered an Order (Docket No. 75) converting the chapter 7 case to a case under chapter 11, title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

16.     On September 15, 2015, the United States filed its Emergency Motion for Entry of an Order Directing the Debtor to Comply with Federal Environmental and Safety Regulations (Docket No. 140) (the "Health and Safety Motion") requesting that the Court direct the Debtor to comply with several critical inspections, monitoring and maintenance requirements pertaining to health, safety and environmental protection (the "Maintenance and Monitoring Obligations").

17.     On September 17, 2015, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors Committee").

18.     On October 13, 2015, this Court granted the United States' Health and Safety Motion directing the Debtor to comply with critical Maintenance and Monitoring Obligations.

19.     On December 14, 2015, the Debtor's Shut In INC was *conditionally* lifted, subject to the Debtor meeting certain conditions specified by BSEE.  To date, the Debtor has not met all of these conditions and has otherwise indicated that it does not intend to recommence operations and has represented that it will be filing a liquidating plan in chapter 11.

20.     Moreover, the Debtor currently has 139 uncorrected incidents of non-compliance (each, an "INC") outstanding issued by BSEE, of which close to 90 INCs have health and safety

implications and are unrelated solely to decommissioning obligations.  The balance of the INCs relate to the Debtor's decommissioning obligations.

A. **DIP Financing**

21.     On February 7, 2016, the Debtor filed a motion (the "Montco Motion") seeking authority to enter into a DIP financing agreement (the "Montco Credit Agreement") with an affiliate of Montco Oilfield Contractors, LLC ("Montco"), known as OW DIP, LLC (the "Montco Affiliate") that would allow the Debtor to borrow up to $7,750,000 (the "Montco DIP Loan") in DIP financing from the Montco Affiliate.

22.     On February 9, 2016, the United States filed its Limited Objection and Reservation of Rights (Docket No. 637) with respect to the Montco Motion.

23.     On February 10, 2016, this Court held a hearing on the Montco Motion and entered an order authorizing the Debtor to obtain interim post-petition financing in the amount of $750,000 (Docket No. 651) (the "Interim DIP Financing Order") under the Montco Credit Agreement.

24.     The Interim DIP Financing Order contained the following reservation of rights in favor of the United States:

> Notwithstanding any other provision of this Order or any of its implementing documents including, without limitation, the DIP Credit Agreement and the related summary of proposed terms, nothing this Order shall limit or affect in any way, the rights of the Department of the Interior with respect to the Debtor's decommissioning obligations, including bonding obligations, associated with its interests in all of its federal oil and gas leases and any rights of use and easement on the Outercontinental Shelf except as may be expressly agreed to by the Department of the Interior.  Nothing in this Order shall limit, or affect in any way, the Debtor's ability to meet its decommissioning obligations except as may be expressly agreed to by the Department of the Interior.  The issuance of any final order from the Department of the Interior shall not constitute a default under the DIP Loan.

25.     On February 29, 2016, the United States filed a limited objection and reservation of rights with respect to the Montco Motion and the Montco P&A Plan (defined below) (the "February 29 Objection").

26.     On March 1, 2016, the Debtor filed a potential term sheet (Docket No. 679) negotiated by the debtor with several key parties in interest, including counsel for the surety, Argonaut Insurance Company ("Argonaut"), counsel for the Noteholder DIP Lenders and counsel to the Creditors Committee, that summarized the terms of potential debtor-in-possession financing on a final basis from Argonaut and the Noteholder DIP Lenders. The United States was not apprised of these discussions despite holding one of the largest administrative and general unsecured claims against the estate and, thus, possibly being the most affected by a proposed financing purporting to grant potential roll-ups and/or superpriority administrative expense claims in favor of the DIP Lenders.

27.     On March 4, 2016, the Debtor filed an emergency motion seeking authority to obtain post-petition financing on a final basis from: (1) Argonaut and (2) the Noteholder DIP Lenders (together with Argonaut, the "DIP Lenders"), which includes, among other noteholders, PPVA Black Elk (Equity) LLC and PPVA Black Elk (Investor) LLC (together, "Platinum Partners")[2], with such Noteholder DIP Lenders' financing being backstopped by funds as may be designated by the Backstop Noteholders.  The Motion attached the Term Sheet and the DIP Facility.

28.     Pursuant to the DIP Facility, the DIP Lenders propose to provide $7.5 million in new money DIP Loans, with $3,500,000 to be furnished by Argonaut and $3,500,000 to be

---

[2] Pursuant to the Corporate Ownership Statement (Rule 7007.1) (Docket No. 94) filed by the Debtor, Platinum Partners directly or indirectly owns 10 percent or more of the Debtor's equity interest and, thus, may be a potential insider of the Debtor.

furnished by the Noteholder DIP Lenders.  The DIP Facility also includes a $500,000

investigation DIP loan (the "Investigation Loan") to be furnished by the Noteholder DIP

Lenders to allow the Creditors Committee to investigate the Insider Causes of Action (as

defined in the Proposed DIP Order).

29.     In exchange for the $7.5 million in new money being extended under the DIP

Facility, the DIP Lenders would receive, among other things: (1) a superpriority administrative

expense claim for all Obligations under the DIP Facility; and (2) the right to credit bid at any

sale of the DIP Lenders' collateral.

30.     Moreover, in exchange for its $3,500,000 contribution of new money, the

Noteholder DIP Lenders would also receive: (1) a first priority lien on, and security interest in,

all unencumbered pre-petition and post-petition property of the Debtor, which includes the P&A

Recovery, the residual interest in the Argonaut/Northstar Collateral (which is collateral that is

expected to be freed up and transferred to a separate collateral account maintained by Argonaut

after a proposed replacement of certain surety bonds by Northstar with bonds to be posted by

Argonaut) and any recovery related to the Grand Isle Litigation; (2) a fully perfected junior lien

on, and security interest in, encumbered pre-petition and post-petition property of the Debtor;

and (3) first priority, senior priming liens on, and security interest in, the P&A Recovery and the

residual interest in the Argonaut/Northstar Collateral (to be shared *pari passu* with Argonaut

until Argonaut is repaid in full).

31.     Finally, in what appears to be a blatant overreach, the Noteholder DIP Lenders are

proposed to receive: (1) a 2-for-1 roll up of each dollar funded under the Noteholder DIP Loan

up to $7,000,000; (2) a roll up of each dollar funded under the Investigation Loan; and (3) a lien

on the $500,000 Roll Up Investigation Loan to be paid from recoveries on account of Insider

Causes of Action, which are expected to be the highest, and possibly only, source of unencumbered assets of the estate from which the Debtor can make distributions to other claimants.

32.     Moreover, under the proposed DIP Facility, the Debtor must seek confirmation of a chapter 11 liquidation plan that is acceptable to the DIP Lenders in both form and substance. Otherwise, the Debtor would be in default under the DIP Facility and Proposed DIP Order, at which point, the automatic stay would be lifted and the full amounts due under the DIP Facility could be accelerated.  Thus, if the DIP Facility is approved, the DIP Lenders will have *de facto* veto power over any chapter 11 plan that the Debtor might propose.  The overreaching provisions set forth in paragraphs 31 and 32 herein shall be referred to as the "Objectionable Terms").

**B.  The Montco P&A Plan**

33.     On February 7, 2016, the Debtor filed the Montco Motion and a revised P&A plan which proposed to retain Montco to perform decommissioning work on a turnkey basis on some, but not all, of the Debtor's operated properties.

34.     On February 24, 2016, the Debtor filed a Notice of Amended Montco Agreement (Docket No. 663) (the "Montco Agreement") and attached an Amended and Restated Turnkey Services Agreement along with a revised decommissioning plan set forth in Schedule A to the Montco Agreement (the "Montco P&A Plan").

35.     The Montco P&A Plan provides for decommissioning on substantially all of the properties for which the Debtor is the designated operator (the "Included Operated Properties") with the exception of several properties in which Debtor is the operator and W&T Offshore Inc. ("W&T") is the prior lessee (the excluded W&T legacy properties for which the Debtor is a

designated operator shall be referred to as the "Excluded Operated W&T Properties").

36.    In addition, the Montco P&A Plan does not include the decommissioning of VR 386B, which is a Merit legacy property.

37.    The Montco P&A Plan also fails to provide for decommissioning on properties in which the Debtor has an interest, but for which the Debtor is not the designated operator (the "Non-Operated Properties"); collectively with the Excluded Operated W&T Properties, VR 386B and any other excluded properties, the "Excluded Properties").

38.    The surety, Argo, is purportedly undercollateralized on its bonds by approximately $24.3 million, has agreed to release portions of its escrow to pay for certain plugging and abandonment work as set forth in the Montco P&A Plan in accordance with an agreed upon funding and escrow release schedule and, in return, will be furnished with adequate protection under the DIP Facility.  If the DIP Facility is approved, Argonaut's collateral shortfall is expected to be significantly reduced by the replacement of the Northstar Bonds by Platinum Partners.

39.    At the hearing on March 1, 2016 to consider the Montco P&A Plan, the United States expressed its non-opposition to the Montco P&A Plan but explicitly reserved its right to object to a motion seeking approval of debtor-in-possession financing.

40.    On March 1, 2016, this Court entered an Order (the "Montco P&A Order") approving the Montco Agreement and the Montco P&A Plan.  The Montco P&A Order specifically provided:

> Notwithstanding any  other provision of this Order or any of its implementing documents, including, without limitation, the Montco Services Agreement, nothing in this Order shall limit or affect in any way the rights of the Department of the Interior with respect to the Debtor's decommissioning obligations, including bonding obligations, associated with the Debtor's interest in all of its federal

oil and gas leases and any rights of use and easement on the Outercontinental Shelf except as may be expressly agreed to by the Department of the Interior. Nothing in this Order shall limit or affect in any way the Debtor's ability to meet its decommissioning obligations except as may be expressly agreed to by the Department of the Interior. For the avoidance of doubt, no provision of this Order is intended to release or limit, and this Order does not release or limit, co-lessees, prior lessees or other parties that are, or may become, jointly and severally liable with the Debtor for decommissioning obligations under any federal oil and gas leases on the Outercontinental Shelf. For the further avoidance of doubt, no provision of this Order is intended to release or limit, and does not release or limit, any surety from its obligations under any bonds posted in favor of the Bureau of Ocean Energy Management ("BOEM") or the United States, whether included in the Montco Services Agreement approved by this Order or not, until such time as the applicable bond may be approved for reduction or cancellation by BOEM after meeting all legal and regulatory obligations required for same. All rights of the Department of the Interior to object to any future sale, transfer, rejection, abandonment or other disposition of any federal oil and gas leases and any rights of use and easement on the Outercontinental Shelf in which the Debtor has an interest, and the properties associated with such leases or rights of use or easement, are expressly preserved. All rights of the United States under 11 U.S.C. § 362(b)(4), 28 U.S.C. § 959(b) or any other applicable laws or regulations are expressly preserved.

## OBJECTION

### A. The Debtor's Environmental Obligations

41.     28 U.S.C. § 959(b) explicitly requires the Debtor to conform with applicable federal, state and local law in conducting its business while acting as a debtor-in-possession in this chapter 11 case. Norris Square Civic Ass'n v. St. Mary Hospital, 86 B.R. 393, 398 (Bankr. E.D. Pa. 1988); see also Midlantic, 474 U.S. at 505 (concluding that 28 U.S.C. §959(b) evidences Congress' intent that the Bankruptcy Code not pre-empt state environmental laws that otherwise constrain the exercise of a trustee's powers).

42.     28 U.S.C. §959(b) provides:

> Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any case pending in any court of the United States, *including a debtor in possession*, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

28 U.S.C. § 959(b) (emphasis added)

43.     As both the Fifth Circuit and this Court have previously recognized, these obligations specifically include preventing environmental damage and complying with state and federal environmental and safety laws, including properly decommissioning oil and gas wells.  In re HLS Energy Co., 151 F.3d 434, 438 (5th Cir. 1988); In re Amer. Coastal Energy Inc., 399 B.R. 805, 807 (Bankr. S.D. Tex. 2009).

44.     The Outer Continental Shelf Lands Act, the regulations enacted pursuant thereto, notices to lessees, the terms of the Leases and other applicable law require the Debtor to, among other things: (i) permanently plug all wells; (ii) remove all platforms and other facilities; (iii) decommission all pipelines; and (iv) clear the seafloor of all obstructions created by the lease and pipeline right-of-way operations. 30 C.F.R. § 250.1703

45.     Decommissioning obligations arise when a well is drilled, a platform or other facility is installed or an obstruction is created or when an entity "becomes a lessee or owner of operating rights of a lease on which there is a well that has not been permanently plugged . . . a platform, a lease term pipeline or other facility or obstruction."  30 C.F.R. § 250.1702. Applicable regulations require the Debtor, and any jointly and severally liable parties (including all operating rights owners holding an interest at the time the obligation accrued and all prior lessees), to permanently plug all wells and remove all platforms and other facilities within one

year after lease termination.  See 30 C.F.R. §§ 250.1701; 1702(d); 250.1710; 250.1725 and 556.64(h)(1).

**B.  Objections to the Motion**

46.  The Court should deny the Motion because the proposed DIP Facility, if approved, would unfairly leverage the bankruptcy process in favor of the Noteholder DIP Lenders at the expense of the Debtor's other administrative and unsecured claimants, the largest of which, is the United States.  This is particularly the case where the environmental, health and safety obligations owing by the Debtor to the United States cannot be abandoned and/or rejected per the Supreme Court's directive in Midlantic.

47.  Although courts generally allow a debtor to exercise a measure of business judgment in determining whether to approve post-petition financing, courts do not allow post-petition financing agreements that contain terms which leverage the bankruptcy process in favor of the post-petition lender.  In re Berry Good, LLC, 400 B.R. 741, 747 (Bankr. D. Ariz. 2008) ("Berry"); In re Ames Dept Stores, Inc., 115 B.R. 39, 40 (Bankr. S.D.N.Y. 1990) ("Ames"). Courts, therefore, look to whether the proposed terms would prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors by granting a lender excessive control over the debtor or its assets.  Berry, 400 B.R. at 747.  Financing should be denied if the primary purpose is to benefit or improve the position of a secured lender. Ames, 115 B.R. at 39 ("a proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); see also, In re Aqua Assocs., 123 B.R. 192 (Bankr. E.D. Pa. 1991) (noting that "credit should not be approved when it is sought for the primary benefit of a party other than the debtor.")

48.     The Objectionable Terms would clearly leverage the bankruptcy process in favor of the Noteholder DIP Lenders and should be denied.  The proposed financing would effectively enable $15 million in superpriority administrative expense claims to be paid ahead of any administrative claims owing by the Debtor to the United States for the Debtor's environmental, health and safety obligations, in exchange for only $7.5 million in new post-petition financing and give the DIP Lenders veto power over any chapter 11 plan.

*(1) The Roll-Ups Should Be Denied*

49.     Cross-collateralization, as well as roll-ups (which generally accomplish the same purpose, namely, allowing a pre-petition claimant to improve its position in the bankruptcy case without providing new post-petition financing), are disfavored means of financing and "may be utilized as a last resort only when the debtor is otherwise unable to obtain needed financing on acceptable terms."  In re Texlon Corp., 596 F.2d 1092, 1097 (2d Cir. 1979); see also, Ames, 115 B.R. at 39 (holding that because cross-collateralization may elevate an undersecured loan to a fully secured status ahead of other similar claims, creditors are entitled to be heard on whether the potential benefit of the arrangement in preserving a business outweigh any prejudice to creditors); Shapiro v. Saybrook Mfg. Co., 963 F.2d 1490, 1494-95 (11th Cir. 1992) ("Cross-collateralization is an extremely controversial form of Chapter 11 financing . . . [e]ven the courts that have allowed cross-collateralization, however, were generally reluctant to do so"); and In re Vanguard Diversified Inc., 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983) ("Vanguard") (ultimately allowing cross-collateralization, but noting that cross-collateralization is a "disfavored means of financing" and should only be used as a last resort).

50.     In Vanguard, the bankruptcy court set forth four conditions that a debtor must meet to obtain a financing order containing cross-collateralization or, in this case, a roll-up: (1)

the debtor's business would fail absent the proposed financing; (2) the Debtor is unable to obtain alternative financing on acceptable terms; (3) the proposed lenders would not accept less preferential terms; and (4) the proposed financing is in the general creditor body's best interest. Vanguard, 31 B.R. at 366.

51.    Moreover, even when a roll-up is granted, courts give it special scrutiny, such as allowing roll-ups only a proportional basis.  See, e.g., In re Lyondell Chem. Co., Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 1, 2009) (ECF No. 1002) at 2-3 (authorizing a roll-up only on a dollar-for-dollar basis after three days of hearings); In re Constar Int'l Holdings LLC, et al., Case 13-13281 (CSS) (Bankr. D. Del. Jan. 16 2014) (ECF No. 212 (authorizing a roll-up of $2.9 million for new advances of $14.5 million).  Some courts have also reserved its authority to unwind the roll-up should a successful challenge be made to the validity, enforceability, extent, perfection or priority of the liens of the pre-petition secured lenders for the pre-petition obligations being rolled up.  See, e.g., In re Foamex Int'l Inc., et al, Case No. 09-10560 (KJC) (Bankr. D. Del. Mar. 19, 2009) (ECF No. 190) at 11-12.

52.    Because a roll-up achieves a similar unfavorable result as cross-collateralization, the same four factors should apply to roll-ups as well.  Here, the Debtor does not intend on operating again but instead intends on liquidating, whether it be in chapter 11 or a chapter 7 scenario.  Second, the Debtor has not yet demonstrated that it could not obtain alternative forms of financing on less onerous terms and that no such financing was available.  Third, how the proposed financing would be in the general creditor body's best interest when the United States' remaining administrative claims alone may likely dwarf any recovery to unsecured creditors in either a chapter 11 or chapter 7 scenario and the DIP Facility saddles the estate with an additional $15 million in superpriority claims is unclear.  Finally, the 2 for-1 roll-up sought by

the Noteholder DIP Lenders is disproportional to the new post-petition financing being extended to this Debtor.

53.     Accordingly, this Court should deny the Roll-Ups.  If this Court determines to grant roll-ups in this case, they should be limited to a proportional dollar-for-dollar basis based on the new advances being made to the Debtor and the Court should reserve the ability to unwind the 2-for-1 roll-up if it is later determined that the Noteholder DIP Lenders do not have a valid springing lien on the Northstar Recovery.

*(2) The Noteholder DIP Lenders Should Not Receive a Lien on Recoveries from the Insider Causes of Action*

54.     The DIP Facility also purports to give the Noteholder DIP Lenders a fully-perfected first priority lien on, and security interest in, the Insider Causes of Action for purposes of the Roll Up Investigation Loan Payment in addition to granting the Noteholder DIP Lenders a superpriority administrative expense claim for the same obligation.

55.     Courts generally do not favor using section 364 to give pre-petition lenders security interests in the proceeds of avoidance actions.  In re Qualitech Steel Corp., 276 F.3d 245, 248 (7th Cir. 2001).  Any recovery under the Insider Causes of Action or any other avoidance actions, therefore, should inure to the benefit of all creditors.  In re Cybergenics Corp., 226 F.3d 237, 244 (3d Cir. 2000).

56.     Any lien on chapter 5 avoidance actions, which are likely to be the only significant source of recovery to pay claimants in this case, is inappropriate and contrary to the interests of the estate and its stakeholders.

57.     Moreover, the United States submits that any recovery under any chapter 5 causes of action should be used to meet the Debtor's remaining decommissioning obligations before

being used to meet the Debtor's general unsecured claims as the Debtor cannot abandon the properties or their associated environmental, health and/or safety liabilities under Midlantic.

*(3) The Debtor Should Present the Chapter 11 Plan for this Court's Consideration at the Same Time as the Final DIP Motion So That Stakeholders Can Determine Whether a Chapter 11 Plan Would Be Confirmable*

58.     Most Problematic is that the DIP Facility appears to essentially encumber all possible source of unencumbered assets that may otherwise have been available for distribution to creditors, thus making it doubtful that a chapter 11 case could be confirmed.

59.     In order to be confirmable, 11 U.S.C. §1129(a)(9) requires that a plan pay in full all administrative claims on the effective date of the chapter 11 plan.  It appears, at best, highly unlikely that the Debtor could meet this requirement given that the Debtor is liable for substantial decommissioning liability that is excluded from the Montco P&A Plan.  The Debtor has indicated that it will not ask the United States to waive its Excluded P&A Claim or other allowable administrative claim that it may have against the estate and that it will negotiate with the United States regarding the treatment of its administrative and other claims pursuant to a chapter 11 plan and a related liquidating trust.  However, without use of the recoveries from chapter 5 causes of action, the United States cannot be paid in full over time as required by the Bankruptcy Code.  The United States would certainly consider such a proposal, but would need to see a chapter 11 plan to determine whether its administrative claims could, in fact, be resolved in this manner.

60.     Thus, to saddle the estate with an additional $15 million worth of superpriority administrative expense claims (which would survive even in a chapter 7 scenario) without first requiring the Debtor to present a confirmable chapter 11 plan would not benefit the estate or its creditors.

61.     In addition, any DIP Budget approved must also provide a means for the Debtor to satisfy its Oil Spill Financial Responsibility, Oil Spill Response Plan, and Maintenance and Monitoring obligations as set forth in the United States' February 29 Objection, which is incorporated herein.

62.     The United States also requests confirmation that BSEE's full regulatory powers remain unimpeded pursuant to 11 U.S.C. § 362(b)(4) to determine what Maintenance and Monitoring requirements must be satisfied.

63.     Finally, the United States requests that the following reservation of rights be included in any Order approving the DIP Facility or other debtor-in-possession financing order:

> Notwithstanding any other provision of this Order or any of its implementing documents including, without limitation, the DIP Credit Agreement and the related summary of proposed terms, nothing this Order shall limit or affect in any way, the rights of the Department of the Interior with respect to the Debtor's decommissioning obligations or the Debtor's ability to meet its decommissioning obligations, including bonding obligations, associated with its interests in all of its federal oil and gas leases and any rights of use and easement on the Outercontinental Shelf except as may be expressly agreed to by the Department of the Interior.  The issuance of any final order from the Department of the Interior shall not constitute a default under the DIP Loan.  For the avoidance of any doubt, the Debtor shall not request that the United States waive any of its allowable administrative or general unsecured claims against the Debtor's estate and any allowable claims that the United States may have against the Debtor's estate, as may be determined by this Court, are expressly preserved.  All rights of the Department of the Interior to object to any future sale, transfer, rejection, abandonment or other disposition of any federal oil and gas leases and any rights of use and easement on the Outercontinental Shelf in which the Debtor has an interest, and the properties associated with such leases or rights of use and easement, are expressly preserved. All rights of the United States under 11 U.S.C. § 362(b)(4), 28 U.S.C. § 959(b) or any other applicable laws or regulations are expressly preserved.

(the "DIP Reservation of Rights").

64.    In sum, the United States would support either a DIP facility stripped of the Objectionable Terms or an alternative form of DIP financing that is less onerous, which would enable the Debtor to meet the maximum amount of its decommissioning obligations.

**WHEREFORE**, the United States respectfully requests that this Court enter an Order: (i) denying the Motion unless modified as requested in this Objection; (ii) requiring the Debtor to present a chapter 11 plan simultaneously with the final DIP financing hearing; (iii) including the DIP Reservation of Rights; (iv) requiring any DIP budget to provide for, and comply with, its OSRP, OSFR, SEMs and Maintenance and Monitoring requirements as set forth in the February 29 Objection;  and (v) granting such other and further relief as this Court deems just and proper.

Dated: Washington, DC
           March 17, 2016

                                    Respectfully submitted,


                                    BENJAMIN C. MIZER
                                    Principal Deputy Assistant Attorney General


                                    KENNETH MAGIDSON
                                    United States Attorney

                                    /s/ *Eunice R. Hudson*
                                    RUTH A. HARVEY
                                    MARGARET M. NEWELL
                                    EUNICE RIM HUDSON
                                    Civil Division
                                    U. S. Department of Justice
                                    P. O. Box 875
                                    Ben Franklin Station
                                    Washington, D.C.  20044-0875
                                    (202) 307-0249


                                    *ATTORNEYS FOR THE UNITED STATES*


### CERTIFICATE OF CONFERENCE

        I hereby certify that: (i) on March 14, 2016, I conferred by e-mail with counsel to the Debtor, (ii) on March 17, 2016, I conferred by telephone with counsel to the Debtor, and (iii) on March 17, 2016, I conferred with counsel to the surety, Argo and counsel to the Debtor regarding the matters set forth in this Objection.  These communications did not fully resolve the United States' objections to the Motion and the United States intends on continuing in discussions with the Debtor prior to the hearing.


                                    /s/ *Eunice Rim Hudson*
                                    EUNICE RIM HUDSON

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 17, 2016, a true and correct copy of the foregoing Objection was duly served upon all parties requesting service via the Court's electronic case filing system (ECF) including, among other parties, the Debtor, the Debtor's counsel, the United States Trustee and Counsel to the Official Committee of Unsecured Creditors.


 /s/ *Eunice Rim Hudson*
EUNICE RIM HUDSON