# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 15-34287 (MI) |
| | § | |
| | § | |
| **BLACK ELK ENERGY OFFSHORE** | § | (Chapter 11) |
| **OPERATIONS, LLC** | § | |
| | § | |
| Debtor | § | |
| | § | |

## DISCLOSURE STATEMENT, PURSUANT TO 11 U.S.C. § 1125, FOR CHAPTER 11 PLAN OF LIQUIDATION OF BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC

Dated, April 12, 2016
Houston, Texas


### BAKER & HOSTETLER LLP
*Attorneys to the Debtor and Debtor-In-Possession*

Elizabeth A. Green, Esq.
Fed ID No. 903144
Email: egreen@bakerlaw.com
Jimmy D. Parrish, Esq.
Fed. ID No. 2687598
Email: jparrish@bakerlaw.com
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL 32801-3432
Telephone: (407) 649-4000
Facsimile: (407) 841-0168


-and-

Jorian L. Rose, Esq.
(*admitted pro hac vice* 9/02/2015)
Email: jrose@bakerlaw.com
45 Rockefeller Plaza
New York, New York
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

Pamela Gale Johnson, Esq.
State Bar No. 10777700
E-mail: pjohnson@bakerlaw.com
Fed ID No. 4481
811 Main Street, Suite 1100
Houston, Texas 77002-6111
Telephone: (713) 646-1324
Facsimile: (713) 751-1717

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 15-34287 (MI) |
| | § | |
| | § | |
| **BLACK ELK ENERGY OFFSHORE** | § | (Chapter 11) |
| **OPERATIONS, LLC** | § | |
| | § | |
| Debtor | § | |
| | § | |

**DISCLOSURE STATEMENT, PURSUANT TO 11 U.S.C. § 1125,**
**FOR CHAPTER 11 PLAN OF LIQUIDATION OF**
**BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC**

## I.     INTRODUCTION AND SUMMARY

This Disclosure Statement ("Disclosure Statement") is filed pursuant to the requirements of Section 1125 of Title 11 of the United States Code (the "Bankruptcy Code"). This Disclosure Statement is intended to provide adequate, necessary, and material information to enable holders of claims in the above-captioned bankruptcy case (the "Bankruptcy Case") to make reasonably informed judgment about the Plan of Liquidation (the "Plan") submitted by Black Elk Energy Offshore Operations, LLC ("Black Elk" or the "Debtor").  The Debtor is soliciting votes to accept the Plan.  The overall purpose of the Plan is liquidate the Debtor's assets and liabilities in a manner designed to maximize recoveries to all creditors.  The Debtor believes the Plan is reasonably calculated to lead to the best possible outcome for all creditors in the shortest amount of time and is preferable to all other alternatives.

**THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN. THIS INTRODUCTION AND SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS**

ENTIRETY, BY THE PLAN. THE PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT AND ANY HOLDER OF ANY CLAIM OR INTEREST SHOULD READ AND CONSIDER THE PLAN CAREFULLY IN LIGHT OF THIS DISCLOSURE STATEMENT IN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS.

EXCEPT AS OTHERWISE PROVIDED HEREIN, CAPITALIZED TERMS NOT OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE MEANING ASCRIBED TO THEM IN THE PLAN.

NO REPRESENTATION CONCERNING THE DEBTOR IS AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS MADE, WHICH ARE OTHER THAN AS CONTAINED HEREIN, SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AUDIT. FOR THAT REASON, AS WELL AS THE COMPLEXITY OF THE DEBTOR'S BUSINESS AND FINANCIAL AFFAIRS, AND THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS WITH COMPLETE ACCURACY, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE. THIS DISCLOSURE STATEMENT INCLUDES FORWARD LOOKING STATEMENTS BASED LARGELY ON THE DEBTOR'S CURRENT EXPECTATIONS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AND ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSIONS, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, CAUSES OF ACTION, AND OTHER ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

Black Elk is a debtor under Chapter 11 of the Bankruptcy Code the above-captioned bankruptcy case pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

As prescribed by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, Claims asserted against, and Interests in, the Debtor are placed into "Classes." The Plan designates seven (7) separate classes of Claims and Equity Interests.[1] The Plan contains one (1) Class of Unsecured Claims. The classification of Claims and the treatment of each Class are discussed in detail below.

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement shall have the meaning ascribed to them in the Plan.

To the extent the legal, contractual, or equitable rights with respect to any Claim or Equity Interest asserted against the Debtor are altered, modified, or changed by treatment proposed under the Plan, such Claim or Equity Interest is considered "Impaired" and the holder of such Claim or Equity Interest is entitled to vote in favor of or against the Plan. A ballot for voting in favor of or against the Plan (the "Ballot") will be mailed along with the order approving this Disclosure Statement.

**THE VOTE OF EACH CLAIM HOLDER OR EQUITY INTEREST HOLDER WITH AN IMPAIRED CLAIM OR INTEREST IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT.**

---

[1] For convenience of identification, the Plan classifies the Allowed Other Secured Claims in Class 5 as a single Class.  This Class is actually a group of subclasses, and each subclass is treated for all purposes hereunder as a distinct Class.

**VOTING DEADLINE**

The last day to vote to accept or reject the Plan is _____, 2016. All votes must be received by BMC Group, Inc., 300 N. Continental Boulevard, Suite 570, El Segundo, CA 90245 by 5:00 p.m. (CST) on that day.

Upon receipt, the Ballots will be tabulated and the results of the voting will be presented to the Bankruptcy Court for its consideration. As described in greater detail in Section IV of this Disclosure Statement, the Bankruptcy Code prescribes certain requirements for confirmation of a plan. The Bankruptcy Court will schedule a hearing (the "Confirmation Hearing") to consider whether the Debtor has complied with those requirements.

You should use the Ballot that will be sent to you to cast your vote for or against the Plan. You may not cast Ballots or vote orally or by facsimile.  A ballot that does not indicate acceptance or rejection of the Plan will not be considered.  Whether or not you vote, you will be bound by the terms and treatment set forth in the Plan if the Bankruptcy Court confirms the Plan. The Bankruptcy Court may disallow any vote accepting or rejecting the Plan if the vote is not cast in good faith.

The Bankruptcy Code permits a court to confirm a plan even if all Classes whose members are holders of Claims or Interests which are impaired within the meaning of Section 1124 of the Bankruptcy Code (each, an "Impaired Class") have not voted in favor of a plan. Confirmation of a plan over the objection of an Impaired Class is sometimes called "cramdown." As described in greater detail in Section V of this Disclosure Statement, the Debtor has expressly reserved the right to seek "cramdown" in the event all Impaired Classes do not vote in favor of the Plan.

**THE DEBTOR URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

608694464.1

II.    **DESCRIPTION OF DEBTOR'S BUSINESS**

    A.    Pre-Bankruptcy Background.

        Formed in November of 2007, the Debtor is a Houston-based oil and natural gas company engaged in the exploration, development, production and exploitation of oil and natural gas properties within the Outer Continental Shelf of the United States in the Gulf of Mexico. While at one time the Debtor held an aggregate interest in more than six hundred seventy-five (675) wells on one hundred seventy-six (176) platforms located across two hundred fifty thousand (250,000) gross acres offshore in the Gulf of Mexico, in recent years the Debtor downsized dramatically.

        In connection with downsizing its operations, in August 2014, the Debtor closed on a sale of seven (7) operating assets and one (1) non-operating asset to Renaissance Offshore, LLC that netted $125.1 million in net proceeds to the Debtor after purchase price adjustments (the "Renaissance Sale"). Following the closing of the Renaissance Sale, the Debtor repurchased $96 million of its Series E Preferred units using proceeds from the Renaissance Sale. Additional significant capital of the Debtor was used to provide collateral to secure the Debtor's plugging and abandonment obligations.

        By September 30, 2014, after paying $96 million to Holders of the Series E Preferred units and other significant amounts to collateralize the Debtor's ongoing P&A obligations, the Debtor was left with a net working capital deficit of approximately $61.9 million and the company's ability to service its debt was in question. The Debtor's bleak outlook was made worse by rapidly falling crude oil prices and constant turnover of key management personnel. In January 2015, the Debtor entered into an additional sale of assets to Northstar Offshore Group, LLC (the "Northstar Sale") in exchange for the assumption of certain liabilities. The Northstar Sale was closed on or about January 9, 2016, however, not all assets have been

transferred to Northstar.  From the perspective of the Bureau of Ocean Energy Management, the Debtor is still the operator of record with respect to the non-transferred properties.  As oil and gas prices remained depressed through 2015, the Debtor lacked the ability to raise additional capital, and the Debtor struggled to pay creditor claims, which ultimately led to certain creditors filing an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against the Debtor.

B.    The Bankruptcy Case.

On August 11, 2015 (the "Petition Date"), four creditors of the Debtor: The Grand, Ltd., Gulf Offshore Logistics, LLC, Ryan Marine Services, Inc., and Laredo Construction, Inc. (collectively, the "Petitioning Creditors") filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against the Debtor ("Involuntary Petition").   On August 31, 2015, the Debtor filed its *Consent to the Order for Relief* and filed its *Motion to Convert the Involuntary Chapter 7 Case to a Voluntary Chapter 11 Case.*  On September 1, 2015, the Court granted both aforesaid motions.

C.    Post-Bankruptcy Events.

1.    *Retention of Baker & Hostetler, LLP and Blackhill Partners, LLC.* Following the filing of the Involuntary Petition, the Debtor retained Baker & Hostetler LLP ("B&H") to serve as Debtor's counsel in connection with the Bankruptcy Case. With the assistance of B&H and input from the Petitioning Creditors, the Debtor immediately implemented a plan to establish credibility with creditors and work with all constituencies in the Bankruptcy Case to maximize value to the Debtor's estate.  Consistent with this plan, shortly after the filing of the Involuntary Petition, the existing directors of the Debtor were replaced with three (3) new directors including two (2) independent directors.  Next the Debtor retained Mr. Jeff Jones and Blackhill Partners, LLC as Chief Restructuring Officer ("CRO") to assist the

7

Debtor in continued efforts to comply with health and safety requirements of the Bureau of Ocean Energy Management ("BOEM") and the Bureau of Safety and Environmental Enforcement ("BSEE"), while also seeking to maximize estate value.

3.     *Criminal Proceeding Filed Against the Debtor.*   On the same day that the Involuntary Petition was filed, the United States Attorney for the Eastern District of Louisiana filed an information in a criminal proceeding against the Debtor alleging violations of the Outer Continental Shelf Land Act ("OCSLA") and the Clean Water Act ("Criminal Proceeding").   The Criminal Proceeding stems from an explosion on the Debtor's West Delta 32 Platform on August 17, 2012.  At the time of the explosion one of the Debtor's subcontractors, Grand Isle Shipyard, Inc., was working on the platform.  The explosion resulted in the loss of lives. On November 19, 2015 a grand jury charged the Debtor with violations of the OCSLA Act, the Clean Water Act and with Involuntary Manslaughter.   In addition, charges were filed against Grand Isle Shipyards, Inc., as well as several individuals unaffiliated with the Debtor.

The United States filed an unliquidated, estimated Secured Claim in the amount of $18 million dollars on February 4, 2016.  The government asserts that the claim is secured by set off or recoupment rights and any lien rights it may have.   The Debtor disputes the claim, which in any event is unliquidated, and contingent.  In addition, on March 21, 2016, the Debtor pled not guilty to the criminal charges and the Debtor has a motion to dismiss the charges currently pending.

4.     *The Shut In INC.*  As of the Petition Date, the Debtor's operations were limited to four (4) operating platforms as well as an additional sixteen (16) platforms that were in the process of being decommissioned.  The Debtor also held a non-operating working interest in nine (9) additional platforms as of the Petition Date.  Shortly after the filing of the Involuntary Petition, BSEE issued a Shut In Incident of Noncompliance ("Shut-In INC") to the Debtor on

8

August 17, 2015 for failing to implement and maintain a safety and environmental management systems program that complies with 30 C.F.R. § 250.1902, the American Petroleum Institute's Recommended Practice for Development of a Safety and Environmental Management Program for Offshore Operations and Facilities as incorporated by reference in 30 C.F.R. § 250.198, and other requirements ("SEMS Deficiencies").

B&H, CRO, and the Debtor's special counsel, Slattery Marino & Roberts ("SM&R"), spent countless hours working with BSEE working through a program to remedy the SEMS Deficiencies. Simultaneously, the CRO, with assistance from B&H and SM&R, also conducted studies regarding the economics of re-commencing operations upon the Shut-In INC being lifted. Ultimately, the Shut-In INC was lifted in December 2015, but the Debtor determined recommencing operations would not be in the best interest of the estate and decided to start the process de-commissioning substantially all of its wells.

5. *Appointment of the Official Committee of Unsecured Creditors*. On September 17, 2015, the United States Trustee for the Southern District of Texas appointed an official committee of the Debtor's unsecured creditors in the Bankruptcy Case consisting of Gulf Offshore Logistics, LLC, The Grand Ltd., Montco Oilfield Contractors, LLC, Shamrock Management LLC, and Ryan Marine Services, Inc. (collectively, the "Committee"). On September 25, 2015, the Committee filed its Application to retain Okin & Adams, LLP as counsel to the Committee ("Okin & Adams Application"). The Bankruptcy Court approved the Okin & Adams Application on October 20, 2015 (Doc. No. 340).

6. *Debtor's Use of Cash Collateral and DIP Loan.* Immediately after entry of the order for relief and conversion of the Bankruptcy Case to a case under Chapter 11 of the Bankruptcy Code, the Debtor had an urgent use for cash to maintain health and safety

requirements of BOEM and BSEE.  Notwithstanding the Debtor's need for cash, it held very little cash on hand to discharge these obligations.

Prior to the Petition Date, the Debtor was in the process of replacing Liberty Mutual Insurance Company ("Liberty Mutual") as its surety bonding company on certain wells with Argonaut Insurance Company ("Argonaut").  The Debtor originally anticipated release of up to $11 million dollars in bond collateral ("Liberty Bond Collateral") held by Liberty Mutual to assist it in funding ongoing health and safety functions.  Unfortunately, as of the Petition Date, the transaction that would replace Liberty Mutual with Argonaut was not fully consummated and Liberty Mutual still had bond obligations outstanding and, as a result, Liberty Mutual claimed an interest in the Liberty Bond Collateral.  In addition, Argonaut and the Debtor's primary secured lender, Bank of New York Mellon Trust Company, N.A. as Trustee ("Initial Trustee") and Collateral Agent for the holders of the 13.75% Senior Secured Notes due 2015, and other parties-in-interest also asserted rights in the Liberty Bond Collateral.  After weeks of negotiations with the various parties-in-interest, the Debtor reached an agreement ("Liberty Compromise") with Liberty Mutual, Argonaut, and TKN Petroleum Offshore LLC ("TKN") and filed an Emergency Motion for Entry of an Order Approving a Settlement and Compromise under Federal Rule of Bankruptcy Procedure 9019 on October 2, 2015 (Doc. No. 257) (the "Liberty Compromise Motion").  The Liberty Compromise Motion was subject to numerous objections, including that of the Ad Hoc Noteholders Group, which asserted a lien in residual bond collateral, and the Debtor again commenced negotiations with numerous parties in order to free up cash to allow it to survive and continue to fund ongoing health and safety obligations of the Debtor.  As a result of these negotiations, the Bankruptcy Court ultimately entered its Order Approving Settlement and Compromise under Federal Rule of Bankruptcy Procedure 9019 on October 28, 2015 (Doc. No. 368) ("Liberty Compromise Order").  As a result of the entry of the Liberty Compromise

608694464.1

Order, the Debtor obtained approximately $2.6 million to fund ongoing health and safety obligations.

While negotiating with Liberty, Argonaut and other parties-in-interest in connection with the Liberty Compromise, the Debtor and its professionals were in discussions with the ad hoc Committee of holders of the Debtor's 13.75% Senior Secured Notes due 2015 (the "Ad Hoc Committee") regarding a debtor-in-possession loan that, coupled with the funds from the Liberty Compromise and other funds, would provide the resources for the Debtor to fund its ongoing health and safety obligations through confirmation of a plan of liquidation, including the plugging and abandonment of its wells.  These negotiations led to the filing of the Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Post Petition Financing and to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling an Initial and Final Hearing, and (IV) Granting Related Relief (Doc. No. 479) ("Initial DIP Motion") on December 6, 2016.   Multiple parties-in-interest, including Platinum Partners Liquid Opportunities Master Fund, LP and Platinum Partners Value Arbitrage Fund, LP (collectively, "PPVA"), the Committee, Argonaut, Merit Energy Company, LLC ("Merit"), W&T Offshore, Inc. ("W&T"), and McMoran Oil & Gas, LLC ("McMoran") objected to the Initial DIP Motion and the Debtor and its professionals commenced settlement discussions with the various objecting parties.

As part of its discussions with the parties objecting to the Initial DIP Motion, Merit offered a financial accommodation to the Debtor that would free up approximately $2 million dollars in cash to provide additional time for the Debtor to finalize a consensual plugging and abandonment plan with various predecessors in interest of the Debtor's platforms ("Merit Agreement").  The primary terms of the Merit Agreement were: (i) Merit would cause its surety to issue replacement bonds for certain bonds the Debtor had in place with Ace Westchester

Insurance Company ("Ace") in favor of BOEM related to the well operated by the Debtor known as East Cam 160; (ii) Upon approval by BOEM of the replacement bonds, Ace would release $7,579,000 of the $9,579,000 it was holding as collateral to Merit to serve as partial collateral for the replacement bond; and would release $2 million dollars to the Debtor for operating funds to pay ongoing health and safety obligations; and (iii) the Debtor would pay the premiums due on the Merit replacement bonds.   After accepting the Merit Agreement, the Debtor filed its Amended Emergency Motion for Authority to Use Cash Collateral on January 9, 2016 (Doc. No. 578) ("Merit Cash Collateral Motion"), which incorporated the terms of the Merit Agreement.

On January 19, 2016, the Ad Hoc Committee, along with Delaware Trust Company, as Successor Collateral Agent and Trustee under that Certain Indenture dated as of November 23, 2010 (as amended, restated, or otherwise modified, the "Indenture"), under which the 13.75% Senior Secured Notes due 2015 were issued ("Trustee") each filed objections to the Merit Cash Collateral Motion again asserting security interests in the residual bond collateral.  At the hearing on the Merit Cash Collateral Motion on the same day, the Debtor, Merit, the Committee, the Ad Hoc Committee, and the Trustee requested a recess and were able to resolve the objections filed by the Ad Hoc Committee and the Trustee.  The Court entered its Order Authorizing Continued Use of Cash Collateral and Approving Stipulation (Doc. No. 609) ("Merit Cash Collateral Order").

The $2 million dollars provided much needed cash to the Debtor to continue funding ongoing health and safety obligations and also gave the Debtor the opportunity to work with its predecessors-in-title and other interested parties in formulating a consensual plugging and abandonment plan.  However, it was still short of the amount needed to get the Debtor to confirmation of a plan of liquidation or fund the Debtor's plugging and abandonment obligations, so the Debtor continued its efforts to secure permanent DIP financing.  While

12

continuing discussions with the Ad Hoc Committee, the Debtor also had discussions with other parties including Merit and Montco Oilfield Contractors, LLC ("Montco") regarding DIP financing.   Key to these discussions was the formulation of an agreeable plugging and abandonment plan as the Debtor's initial plugging and abandonment plan was unacceptable to several of the Debtor's predecessors-in-title.

As discussions between the various parties progressed, the Debtors determined that the DIP financing terms offered by Montco and Merit were, at that time, more advantageous to the Debtor and its estate.   With the support of Merit, the Debtor focused its efforts in negotiating a DIP with Montco and ultimately reached an agreement with Montco on the terms of a DIP loan ("Montco DIP Loan") which would provide post-petition financing up to $7.75 million dollars to the Debtor.   As part of the Montco DIP Loan, the Debtor was also able to secure a turnkey plugging and abandonment commitment from Montco ("Final Montco Services Agreement") which was crucial to receiving support of a plugging and abandonment plan from the Debtor's predecessors-in-interest.   Entry and Bankruptcy Court approval of the Final Montco Services Agreement was a condition precedent of the Montco DIP Loan.

In connection with the Montco DIP Loan and Final Montco Services Agreement, the Debtor filed its Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post Petition Financing and to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling an Initial and Final Hearing, (IV) Approving Montco Contract and Funding Global P&A Plan, and (V) Granting Related Relief on February 7, 2016 (Doc. No. 630) ("Montco DIP Motion"). The Montco DIP Motion was met by several objections, including objections from the Ad Hoc Committee, PPVA, Alta Mesa Holdings, LP ("Alta Mesa"), Cairn Energy USA, LLC ("Cairn Energy"), and Marubeni Oil & Gas USA, Inc. ("Marubeni"), including, among other things, related to the nonconsensual

priming nature of the DIP facility.  At the hearing, the Court provided a recess for the parties to confer and continue ongoing settlement discussions and the Debtor was able to resolve the various objections. Thereafter, the Bankruptcy Court entered its Interim Order Under 11U.S.C. §§ 105, 361, 362, 363(c), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 507 and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing the Debtors to Obtain Post-Petition Financing, and (II) Scheduling Final Hearing on February 10, 2016 (Doc. No. 651) ("Interim Montco DIP Order") and on March 1, 2016, the Bankruptcy Court entered its Order Under 11 U.S.C. §§ 105, 361, 362, 363(c), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 507 and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing the Debtor to Enter Into the Montco Services Agreement and (II) Granting Related Relief (Doc. No. 682) ("Montco Services Order").

Following entry of the Interim Montco DIP Order, the Debtor continued working with Montco, the Ad Hoc Committee, Argonaut and other parties-in-interest in order to reach a consensual resolution.  From these discussions, the parties started developing an alternative to the Montco DIP Loan which would be funded, in part, by the holders of the Senior Notes and, in part, by Argonaut (the "Note Holder/Argonaut DIP Loans").  The ultimate terms of the Note Holder/Argonaut DIP Loan provided for the Debtor to obtain post-petition financing in the aggregate principal amount of $15,000,000 consisting of (a) $7,000,000 of new funding for the Debtor ("New Money DIP Loans"), (b) $7,000,000 of roll up financing related to operations for the Debtor ("Roll Up Operating DIP Loans"), (c) $500,000 of new funding to investigate causes of action ("Investigation Loans"), and (d) $500,000 of roll up financing related to investigation for the Debtor ("Roll Up Investigation Loans").  Ultimately, with the support of Montco, Merit, the Ad Hoc Committee, and the Committee, the Debtor agreed to the Note Holder/Argonaut DIP Loan and filed its Emergency Motion for Entry of a Final Order (I) Authorizing the Debtor to

14

Obtain Post Petition Financing and to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, and (III) Granting Related Relief on March 4, 2016 (Doc. No. 691) ("Note Holder/Argonaut DIP Motion").  The Bankruptcy Court conducted a hearing on March 18, 2016 to consider the Note Holder/Argonaut DIP Motion and later entered its Final Order Under 11 U.S.C. §§105, 361, 362, 363(c), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 and Bankruptcy Rules 2002, 4001, and 9014 Authorizing the Debtor to Obtain Post-Petition Financing on a Final Basis (Doc. No. 717) ("Note Holder/Argonaut DIP Order").

During the Bankruptcy Case, the Bankruptcy Court entered the Cash Collateral Orders (as defined in the Plan) authorizing the Debtor to use cash collateral.  In connection with the Cash Collateral Orders, the Order Granting Adequate Protection entered on January 19, 2016, and the Final DIP Order,  the Bankruptcy Court granted the holders of the Senior Notes various forms of adequate protection, including, but not limited to, the following: (a) an administrative claim under Section 507(b), to the maximum extent allowed by law for the use of cash collateral under the Cash Collateral Orders; (b) replacement and adequate protection liens on assets acquired by the Debtor on or after September 15, 2015; (c) $994,000 in cash payments by the Debtor to the Indenture Trustee or the Ad Hoc Noteholders; and (d) and valid and perfected replacement and adequate protection liens on unencumbered assets subject to caps as set forth in the orders to protect against losses occasioned by the use of the cash collateral, provided that no lien was granted against the funds collateralizing the Debtor's P&A Obligations.

7.      *Formulation of the Debtor's Final P&A Plan for Operating Properties.*  The Debtor devoted in excess of three months working with its sureties, predecessors, BOEM/BSEE, the Ad Hoc Committee and Committee to formulate a consensual P&A plan with respect to its operated oil and gas properties.  The Debtors initial P&A plan, which required consent of all predecessors in title to utilize certain funds, was rejected by them for, among other things, its

failure to include turnkey contracts.  Initially, the Debtor had negotiated with Montco, a contract with a "not-to-exceed" contract price of $106,088,593 ("Initial Montco Contract").  This contract contained potential significant upside to the Debtor's estate as it contained a lower lump-sum price of $86,201,183.  The contract heavily incentivized Montco to meet or exceed the lump sum price. The Debtor believes the Initial Montco Contract provided significant potential benefits and was close to a turnkey contract given the "not-to exceed" pricing. However, predecessors of the Debtor objected to the Initial Montco Contract and indicated they would not accept any proposal that was not unequivocally a turnkey contract.

While the Debtor disagreed with the predecessors' interpretation of the Initial Montco Contract and their perceived lack of certainty under such contract, the Debtor recognized that entering into anything other than turnkey contracts would not permit agreement from the predecessors. Because of the zero sum nature of this process, the Debtor reformulated the P&A plan so that: (1) less potential bond collateral would be available for return to the estate and (2) Argonaut would be required to agree to fund up to its full penal sum ($83.3 million) as opposed to merely committing the bond collateral it holds on hand.  The roughly $23 million dollar difference between Argonaut's collateral and the full penal sum puts Argonaut in a different position from all other bonding sureties that held sufficient collateral.

Working with these two material components, the Debtor worked with the predecessors, Montco and Argonaut to formulate an operating P&A (the "P&A Plan") which was ultimately approved by the Bankruptcy Court by Order in connection with approval of the Montco services Agreement on March 1, 2016 (the "P&A Approval Order"). A copy of the P&A Plan is attached hereto as **Exhibit "A"**.

The P&A Plan is based on the Final Montco Services Agreement which provides for the P&A on a turnkey basis of substantially all of the Debtor's operated P&A liabilities with

16

the exception of the Merit-related properties where Merit will have the discretion to choose the P&A contractor to conduct such P&A.  The Final Montco Services Agreement as approved by the Bankruptcy Court is integral to the Plan.  The Final Montco Services Agreement is intended to be assigned to the Liquidating Trust under the Plan.

With respect to payment, Montco has agreed in the Final Montco Services Agreement to look to release of bond collateral and certain escrow collateral for payment for its P&A activities.  Specifically, Montco has agreed to wait until site clearance is received for any property prior to receiving payment.  The P&A Plan requires the applicable surety to release the turnkey price up to the penal sum of the applicable bond to Montco.  This applies to Argo despite its collateral deficiency.

8.      *P&A Plan for Non-Operated Properties.*  In addition to its operated oil and gas properties, the Debtor has interests in oil and gas properties for which it is not the operator (the "**Non-Operating Interests**").  While the P&A Plan addresses substantially all of the Debtor's oil and gas properties decommissioning obligations for which it has control, the Debtor believes that it has sufficient funds in escrow or bonding to satisfy liabilities associated with the estimable liabilities associated with the Non-Operating Interest, with the exception of one property interest which it proposes to abandon. The Debtor is currently in negotiations with the operator of certain properties, including the one proposed for abandonment, to withdraw consensually or otherwise sell those interests.  To the extent the Debtor is unable to withdraw consensually from certain properties, the Debtor reserves the right to abandon those properties.

III.    **THE PLAN**

THE FOLLOWING SUMMARY IS INTENDED ONLY TO PROVIDE AN OVERVIEW OF THE DEBTOR'S PLAN.  ANY PARTY IN INTEREST CONSIDERING A VOTE ON THE PLAN SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY

17

**BEFORE MAKING A DETERMINATION TO VOTE IN FAVOR OF OR AGAINST THE PLAN.  THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.**

A.     <u>Overview.</u>

The purpose of the Plan is to provide for the orderly wind-down of the Debtor's operations, the liquidation of the Debtor's assets, the satisfaction of the Debtor's environmental liabilities, and the orderly distribution of the Debtor's remaining assets to creditors.

The Plan contemplates the creation of two trusts, the Litigation Trust and the Liquidation Trust, into which all of the Debtor's assets will be transferred.  On the Effective Date, the Debtor will transfer the Litigation Trust Assets to the Litigation Trust, and transfer the Debtor's remaining assets, defined in the Plan as the Liquidation Trust Assets, to the Liquidation Trust.   In the event that the Debtor and Northstar reach an agreement on terms, and upon consent of various parties as set forth in Section VII(C) of the Plan, the Debtor will transfer the Northstar Assets to Northstar on or before the Effective Date, and in such event the Northstar Assets shall not become property of either the Litigation or Liquidation Trusts.

Following the transfers described in the immediately preceding paragraph, the Debtor shall be deemed dissolved.

All Claims against the Debtor shall be classified and treated pursuant to the terms of the Plan. As noted more fully below, the Plan contains seven (7) Classes of Claims and Interests. There are four (4) Classes of Secured Claims, one (1) Class of Priority Non-Tax Claims, one (1) Class of Unsecured Claims, and one (1) Class of Interests.

B.     Classification and Treatment of Administrative Expense Claims, Priority Tax Claims and United States Trustee Statutory Fees.

1.     Administrative Claims.

a.     DIP Superpriority Claims.

The DIP Superpriority Claims shall be Allowed in the full amount due and owing under the Cash Collateral Orders, DIP Documents and Final DIP Order, and no Holder of a DIP Superpriority Claim shall be required to file an application, motion, or request with the Bankruptcy Court for allowance of such Claim as an Administrative Claim.  Except to the extent that a Holder of an Allowed DIP Superpriority Claim agrees to a less favorable treatment, each Holder of an Allowed DIP Superpriority Claim shall receive Cash equal to the full amount of its Allowed DIP Superpriority Claim in full and final satisfaction of such Claims.

b.     Regulatory Agencies Administrative Claims.

The Regulatory Agencies shall file an application, motion or request with the Bankruptcy Court for allowance of their claims as Administrative Claims in accordance with the procedures set forth below in Section II(a)(3).

The US Department of Interior has filed an administrative claim in the amount of $660,606,223.00 related to the Debtor's plugging and abandoning obligations.   As previously provided herein, the Debtor entered into and the court approved the Montco Services Contract and the P&A Plan which provide for the plugging and abandonment obligations for substantially all of the Debtor's operating properties.  The P & A Plan will reduce the Debtor's plugging and abandonment obligations on substantially all of the Debtor's operating properties to zero.   In addition to operating properties, the Debtor owns non-operating interests in various properties that are dealt with under the Plan.  The Debtor does not have the primary obligation to P&A the non-operating properties, many of which are still operating.   After the application of

19

existing bonds and escrows, the Debtor believes that its P&A obligations on the non-operating properties will also be reduced to zero.   Thus, the Debtor estimates the claim of the Department of Interior to be zero and anticipates filing a motion with the Bankruptcy Court seeking a determination from the Bankruptcy Court that the claim of the Department of Interior should be estimated at zero for all purposes.   Alternatively, if the Bankruptcy Court determines that the Department of Interior has a significant administrative claim, the case will be converted to Chapter 7 unless an agreement can be reached as to an alternative treatment of the Department of Interior's asserted administrative claim.   Any alternative treatment of any administrative claim will reduce the return to holders of allowed unsecured claims.

c.      Filing Administrative Claims.

Any Person that asserts an Administrative Claim arising before the Confirmation Date, including Claims under Section 503(b) of the Code, but excluding (a) Administrative Claims for an expense or liability incurred and payable in the ordinary course of business by the Debtor; (b) fees payable by the Debtor pursuant to 28 U.S.C. §1930 or any interest accruing thereto; (c) fees and costs of professional advisors (e.g., attorneys, financial advisors, and accountants) retained by the Debtor or Creditors' Committee in the Case ("Professional Fee Claims"); and (d) claims that are entitled to priority pursuant to §507(a)(8) of the Bankruptcy Code, shall, on or before the Administrative Claims Bar Date or other date as set by Bankruptcy Court Order, file an application, motion, or request, as called for by the Rules, with the Bankruptcy Court for allowance of such Claim as an Administrative Claim specifying the amount of and basis for such Claim; *provided, however,* that applicants or movants who have previously filed applications, motions, or requests with the Bankruptcy Court need not file another such paper for the same Claim. Failure to file a timely application, motion, or request for allowance pursuant to this Section by any Holder of an Administrative Claim for an expense or

liability incurred that is not payable in the ordinary course of business by the Debtor, other than

such a Professional engaged or employed by the Debtor, the Committee, the Liquidation Trust

and the Litigation Trust, shall bar such a claimant from seeking recovery on such Administrative

Claim.

                d.        <u>Treatment of Administrative Claims.</u>

                Except to the extent that a Holder of an Allowed Administrative

Claim agrees to a different treatment, in writing, each Holder of an Allowed Administrative

Claim shall receive, in full satisfaction, settlement and release of and in exchange for such

Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim,

either: (i) as soon as reasonably practicable after the Effective Date, or (ii) if the Administrative

Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such

Administrative Claim becomes an Allowed Administrative Claim; provided, however, an

Allowed Administrative Claim representing obligations incurred in the ordinary course of

business of the Debtor may be paid by the Debtor in the ordinary course, consistent with past

practice of the Debtor and in accordance with the terms and subject to the conditions of any

agreements governing, instruments evidencing, or other documents relating to, such liabilities,

without further action by the Holders of such Administrative Claims or further approval by the

Bankruptcy Court; and provided, further, that other than Investigation Fees, Allowed

Administrative Claims shall not be payable from any Litigation Trust Assets, including, but not

limited to the Investigation Loan.

                2.        <u>Priority Tax Claims.</u>

                Each holder of an Allowed Priority Tax Claim will be paid either (i) the

full amount of the Allowed Priority Tax Claim (without post-petition interest or penalty) in Cash

on the Effective Date or as soon thereafter as is reasonably practicable, or (ii) such lesser amount

as to which the holder of an Allowed Priority Tax Claim may agree.

   3.   Fees Under 28 U.S.C. § 1930.

   All fees payable in the Bankruptcy Case under 28 U.S.C. § 1930, will, if

not previously paid in full, be paid in Cash on the Effective Date and will continue to be paid by

the Liquidation Trust as required under 28 U.S.C. § 1930 until such time as an order is entered

by the Bankruptcy Court closing the Bankruptcy Case.

   C.  Classification of Claims and Interests.

   The following table designates the Classes of Claims and Interests in the Debtor

and specifies which of those Classes are (i) impaired or unimpaired by the Plan, (ii) entitled to

vote to accept or reject the Plan in accordance with Section 1126 of the Code, and (iii) deemed to

reject the Plan:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Allowed Priority Non-Tax Claims | Unimpaired | No |
| Class 2 | Note Holder DIP Secured Claim | Impaired | Yes |
| Class 3 | Argonaut DIP Secured Claim | Impaired | Yes |
| Class 4 | Senior Notes Claim | Impaired | Yes |
| Class 5 | Other Secured Claims | Impaired | Yes |
| Class 6 | General Unsecured Claims | Impaired | Yes |
| Class 7 | Interests in the Debtor | Impaired | No (deemed to reject) |

   For convenience of identification, the Plan classifies the Allowed Claims in Class

5 as a single Class.  This Class is actually a group of subclasses, and each subclass is treated for

all purposes hereunder as a distinct Class.

   D.  Treatment of Claims and Equity Interests.

   1.   Class 1 — Priority Non-Tax Claims

   The legal, equitable and contractual rights of the Holders of Class 1

Claims are unaltered by the Plan.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to different treatment, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Non-Tax Claim, Cash in an amount equal to such Allowed Priority Non-Tax Claim, either: (i) as soon as reasonably practicable after the Effective Date, or (ii) if the Priority Non-Tax Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim.  To the extent that such claims exist, Priority Non-Tax Claims are unimpaired and, as such, are not entitled to vote on the Plan.

   2.  <u>Class 2 — Note Holder DIP Secured Claim.</u>

    Class 2 consists of the Allowed Note Holder DIP Secured Claim.  All Note Holder DIP Secured Claims shall be Allowed in the full amount due and owing under the DIP Documents and Final DIP Order.  In full satisfaction of the Allowed Note Holder DIP Secured Claim, on or before the Effective Date, the Litigation Trust and the Liquidating Trust shall enter into the DIP Exit Facility.  The Class 2 Claim is Impaired and, as such, the Holders of DIP Secured Claims are entitled to vote on the Plan.

   3.  <u>Class 3 – Argonaut DIP Secured Claim.</u>

    Class 3 consists of the Allowed Argonaut DIP Secured Claim.  All Argonaut DIP Secured Claims shall be Allowed in the full amount due and owing under the DIP Documents and Final DIP Order.  In full satisfaction of the Allowed Argonaut DIP Secured Claim, on or before the Effective Date, the Litigation Trust and the Liquidating Trust shall enter into the DIP Exit Facility.  The Class 3 Claim is Impaired and, as such, the Holders of Argonaut DIP Secured Claim are entitled to vote on the Plan.

4.      <u>Class 4 – Senior Notes Claim.</u>

Class 4 consists of the Allowed Senior Notes Claim.  The Senior Notes Claim shall be Allowed in the full amount of the Senior Notes Pre-Petition Obligations.  In full satisfaction of the Allowed Class 4 Claim, on or before the Effective Date Allowed Senior Notes Claim Holder shall receive, to the extent not otherwise satisfied by proceeds from collateral, Senior Litigation Trust Interest in the amount of the Adequate Protection Liens to the extent they attach to Trust Causes of Action (as defined in the Final DIP Order), and (ii) a Senior Liquidated Trust Interest, as adjusted by the Senior Note Liquidating Trust Treatment provided in the Final DIP Order.   The Senior Litigation Trust Interest shall be paid after payment of all administrative costs of the Litigation Trust, but prior to any payment to Holders of Litigation Trust Beneficial Interests.  The Senior Liquidation Trust Interest shall be paid after all other expenses of the Liquidation Trust are paid, but prior to any residual payment to the Litigation Trust.  The Class 4 Claim is Impaired and, as such, the Holders of the Senior Notes Claims are entitled to vote on the Plan.

5.      <u>Class 5 – Other Secured Claims.</u>

Class 5 consists of the Allowed Other Secured Claims.   For purposes of voting and distribution, each Holder of an Other Secured Claim shall be deemed to be classified in a separate subclass of Class 5.  Because each of the Other Secured Claims are subordinate to the Note Holder DIP Secured Claim, the Argonaut DIP Secured Claim, and the Senior Notes Claim, the Allowed Class 5 Claims are wholly unsecured and will be treated as general unsecured claims in accordance with Class 6.  The Class 5 Claim is Impaired and, as such, the Holders of the Other Secured Claims are entitled to vote on the Plan.

6.      <u>Class 6 - General Unsecured Creditors</u>.

Class 6 consists of the collective holders of Allowed Unsecured Claims

against the Debtor.  Each Allowed Claim shall receive a Pro Rata Share of the Litigation Trust Beneficial Interests and shall be entitled to receive distributions from the Litigation Trust in accordance with the Plan.

The Class 6 Claim is Impaired and, as such, Unsecured Claims are entitle to vote on the Plan.

7.      Class 7 – Interests in the Debtor.

Class 7 consists of the collective Interests in the Debtor.  The Debtor's Interests will be cancelled on the Effective Date of the Plan.  Each holder of an Interest shall neither receive nor retain any property or interest in property on account of such Interest and such holder shall have no Claim against the Debtor, the Litigation Trust, the Liquidation Trust or otherwise on account of such cancelled Interest.  Because the Class 7 Interests are being cancelled, Holders of Interests are deemed to reject the Plan and, as such, they are not entitled to vote on the Plan.

E.      Means of Implementation.

A.      Transfers of Property.

1.      On the Effective Date, the Debtor shall be deemed to have irrevocably transferred and assigned:

a.      To the Litigation Trust, the Litigation Trust Assets, to hold in trust for the benefit of the all Holders of Allowed Claims with respect to the Debtor pursuant to the terms of this Plan and of the Litigation Trust Agreement.   Except as otherwise provided by this Plan or the Litigation Trust Agreement, upon the Effective Date, title to the Litigation Trust Assets shall pass to the Litigation Trust free and clear of all Claims and Interests, in accordance with Section 1141 of the Code, except for the liens relating to the Investigation Loan, the Roll Up Investigation Loan and the previously granted Adequate Protection Liens, which shall continue to

encumber the Litigation Trust Assets to the same validity, extent and priority as existed prior to the Effective Date.  For the avoidance of debtor, all rights and causes of action against Platinum shall be transferred to the Litigation Trust and shall constitute Litigation Trust Assets, all of which rights and causes of action are expressly reserved.

      b.     To the Liquidation Trust, the Liquidation Trust Assets, to hold in trust for the benefit of the all Holders of Allowed Claims with respect to the Debtor pursuant to the terms of this Plan and of the Liquidation Trust Agreement.  Except as otherwise provided by this Plan or the Liquidating Trust Agreement, upon the Effective Date, title to the Liquidation Trust Assets, shall pass to the Liquidation Trust free and clear of all Claims and Interests, in accordance with Section 1141 of the Code.

      2.     <u>Causes of Action to be Transferred to and Retained by the Litigation Trust.</u>  Except as may be specifically provided in the Plan and excluding the Northstar Collateral, the P&A Recoveries, and the Grand Isle Litigation (as those terms are defined in the Plan), any and all claims and causes of action owned by the Debtor and its Estate as of the Effective Date shall be transferred, retained and prosecuted by the Litigation Trust as representative of the Estate in accordance with §1123(b)(3)(B) of the Bankruptcy Code subject to the provisions of the Final DIP Order.  The causes of action shall include, but not be limited to the following:

      (i)     Any and all claims and causes of action for avoidance and recovery under §§ 541, 542, 543, 544, 545, 547, 548, 549, 550, 553(b) of the Bankruptcy Code and all applicable state law, including claims against all parties who received payments within the ninety (90) days prior to the Petition Date identified in 3(b) of the Debtor's Statement of Financial Affairs and all insiders who received payments within one (1) year of the Petition Date identified in 3(c) of the Statement of Financial Affairs;

26

        (ii)      Any and all claims and causes of action against former officers, directors, managers, and employees of the Debtor (other than Blackhill Partners, LLC, its officers and partners, Anna Phillips, Tom Pratt and any entity owned or controlled by such persons), including, but not limited to claims for breach of fiduciary duty, fraud, misrepresentation, self-dealing, breach of contract, misuse of collateral, negligence, conversion, embezzlement, conflict of interest, and misuse of inside information;

        (iii)     Any and all claims and causes of action against any former auditor of the Debtor and their respective insurers;

        (iv)     Any and all claims and causes of action against Freedom Well Services, LLC, its members, officers, directors, and affiliates.

        (v)      Any and all claims and causes of action against Uri Landesman, White Elk, LLC, PPVA, their officers, directors, employees and affiliates in connection any and transactions with the Debtor;

        (vi)     Any and all claims and causes of action against the Debtor's direct and indirect equity interest holders and their respective insurers;

        (vii)    Any and all claims and causes of action asserted in current litigation (excluding the Grand Isle Litigation) including all litigation referenced in the Debtor's Statement of Financial Affairs; and

        (viii)   Any and all claims and causes of action against any current or former contractor or service provider of the Debtor, including but limited to, JAB Energy Solutions, L.L.C.

*In addition there may be numerous additional causes of action based upon state or federal law which currently exist or may arise that are not set forth in this Disclosure Statement, because the facts that form the basis of such causes of action are not fully or currently known by the Debtor ("Unknown Causes of Action"). This is primarily due to the fact that when the CRO initially gained access to the Debtor's books and records, those records were incomplete and in complete disarray. Moreover, all of the Debtor's senior*

*management has been replaced and the CRO and Blackhill have had to reconstruct many of the business records of the Debtor with little or no help from prior management. Additionally, the Debtor has just started its initial investigation of potential claims and the Plan is premised on the Litigation Trust continuing the investigation of potential causes of action. The failure to list any Unknown Causes of Action in this Disclosure Statement or the Plan is not in any way intended to waive such Unknown Causes of Action or limit the rights of the Litigation Trust to pursue such Unknown Causes of Action*.

Based on the Debtor's initial preliminary investigation into the various potential causes of action, the Debtor has determined:

(A)     Since January 2013, Black Elk's books and record show that Black Elk expected to receive approximately $360 million in cash as the result of various sale transactions, as well as the release of certain cash collateral supporting surety bonds not affiliated with those asset sales. Of that amount, Black Elk's financial records show that only $315 million was received in Black Elk accounts. The remaining $45 million was not received by Black Elk as expected. Black Elk is investigating the individual transfers comprising the $45 million in funds expected but not received.

Of the $315 million actually received into Black Elk accounts, at least $95 million was transferred directly into the accounts of Platinum Partners and its related entities. Of that sum, $78 million was transferred out of Black Elk accounts within 5 days of Black Elk's receipt of funds from the sale of assets to Renaissance in August 2014. Black Elk's statements of accounts provide the details surrounding each disbursement. Black Elk is investigating the factual basis for each transfer of funds directly into a Platinum account. Platinum Partners has alleged to the Debtor that it has defenses to any of the estate's claims and otherwise reserves its rights in connection with any litigation to be commenced.

Of the $315 million received in Black Elk accounts since January 2013, in addition to the $95 million transferred directly into Platinum accounts, $160 million in funds was disbursed to various parties. Approximately $42 million of the $160 million was transferred to White Elk LLC. Over $20 million was paid to New Mountain Finance. The relationships between those entities and interested and/or related parties are currently being investigated.

(B)     For years prior to the Petition Date the financial books and records were in disarray and that no effort was made to comply with reasonable accounting standards. This is true despite the fact that the Debtor was required to provide public reporting and had retained auditors. The Debtor continues to investigate potential auditor claims.

(C)     There were also a number of transfers made within the 90 days prior to the commencement of these cases, and within 1 year to insiders, including but not limited to those transfers set forth on the Debtor's Statement of Financial Affairs #'s 3A & B. The Debtor reserves any and all claims and causes of action related those potential action under Chapter 5 of the Bankruptcy Code or otherwise.

2.      Dissolution of the Debtor.     Following the transfers described in the immediately preceding paragraph, the Debtor shall be deemed dissolved.

3.      Northstar Assets.     In the event that the Debtor and Northstar reach an agreement on terms, and upon consent of various parties as set forth in Section VII(C) of the Plan, the Debtor will transfer the Northstar Assets to Northstar on or before the Effective Date, and in such event the Northstar Assets shall not become property of either the Litigation or Liquidation Trusts. Upon the transfer of the Northstar Assets bond collateral in the estimated amount of $14 million, the DIP Lenders have a lien on the returned collateral.

4.      Litigation Trust.   The Litigation Trust will be controlled by the Litigation Trustee, subject to the oversight, review and guidance of the Litigation Trust Committee.  The Creditors' Committee and the Backstop Lenders (as defined in the Final DIP Order) shall jointly select the Litigation Trustee on or before the Effective Date.  The Litigation Trust Agreement shall control the formation, operations and dissolution of the Litigation Trust.  The Litigation Trust shall be established for the sole purpose of liquidating and distributing its assets, with no object to continue or engage in the pursuit of a trade or business.  The Litigation Trust will liquidate the Litigation Trust Assets in an orderly fashion, and shall be responsible for paying the following Claims (in the order of priority shown) from the Liquidation Trust Assets:  (i) the Investigation Loan; (ii) the Roll Up Investigation Loan; (iii) the Adequate Protection Liens to the extent they attached to any Causes of Action which are also Litigation Trust Assets; (iv) Allowed Non-Tax Priority Claims; and (v) Allowed Unsecured Claims.  For the avoidance of doubt, all expenses (but not professional fees) of the Litigation Trust that are directly related to Causes of Action which are also Litigation Trust Assets shall be taxed against the gross proceeds of the Litigation Trust and shall be prior to any liens against the Litigation Trust Assets.  Other than the enumerated claims, no claims against the Debtor or its Estate shall be charged to the Litigation

608694464.1

Trust.

5.    <u>Liquidation Trust.</u>    The Liquidation Trust will be controlled by the Liquidation Trustee, subject to the oversight, review and guidance of the Liquidation Trust Committee.  The Backstop Lenders shall jointly select the Liquidation Trustee on or before the Effective Date.   The Liquidation Trust Agreement shall control the formation, operations and dissolution of the Liquidation Trust.  The Liquidation Trust shall be established for the general purposes of winding up the Debtor's business, resolving all P&A Obligations associated with the Debtor's operations, and liquidating and distributing the Liquidation Trust's Assets, with no objective to continue or engage in the pursuit of a trade or business.   On the Effective Date, the Debtor shall be deemed to assign all of its right, title and interest in the Montco Services Agreement to the Liquidation Trust, as well as the other agreements identified in the Plan.   The Liquidation Trustee shall assume and perform all of the Debtor's obligations under the Montco Services Agreement.

6.    <u>P&A Escrows.</u>  For the avoidance of doubt, on the Effective Date, the P&A Escrows shall be deemed transferred to the Liquidation Trust, subject to the liens of the Noteholder DIP Lenders, DIP Superpriority Claim and the liens of Delaware Trust as Indenture Trustee for the Senior Notes to the extent provided they Final DIP Order, and become property of the Liquidation Trust, and shall be liquidated in accordance with Section VII(F) of the Plan.

6.    <u>Abandonment.</u>

The filing of the Plan shall constitute the filing of a Motion to Abandon pursuant to 11 U.S.C. 554 and to relinquish all of the Debtor's rights, interest and title in the assets on the attached **Exhibit "B"**. Entry of the Confirmation Order shall constitute approval to abandon the properties or any interest that the Debtor may have. The abandonment will not impact any bonds or escrows related to the property being abandoned.

608694464.1

7.   Additional Provisions.   Additional provisions regarding the means of implementation of the Plan are set forth in Section VII, including provisions relating to: (i) procedures for resolving Disputed Claims, such as provisions governing objections to Claims and estimation of Claims, (ii) notices regarding the deemed disallowance of certain Claims and Interests held by Entities against whom the Debtor has certain claims, and (iii) procedures for the determination of any controversy concerning whether any Claim, Interest or Class is Impaired.

F.   Leases and Executory Contracts.

To the extent the Debtor rejects any executory contract or unexpired lease prior to the Confirmation Date, any party asserting a Claim, pursuant to Section 365 of the Code, arising from the rejection of an executory contract or unexpired lease shall file a proof of such Claim within thirty (30) days after the entry of an Order rejecting such contract or lease, and any Allowed Claim resulting from rejection shall be a Class 6 Unsecured Claim. The Debtor shall have through and including the hearing on Confirmation within which to assume or reject any unexpired lease or executory contract; and, further, that in the event any such unexpired lease or executory contract is not assumed (or subject to a pending motion to assume) by such date, then such unexpired lease or executory contract shall be deemed rejected as of the Confirmation Date.

## IV.   TAX CONCERNS

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AS MANDATED BY SECTION 1125 OF THE BANKRUPTCY CODE AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

A.   Certain U.S. Federal Income Tax Consequences to the Debtors.

The Debtors will generally realize gain or loss on the sale, or transfer to the Litigation Trust and the Liquidating Trust, of substantially all of their assets equal to the difference between (i) the amount realized on the sale and the fair market value of the assets sold

or transferred to such Trusts, and (ii) their adjusted tax basis in the assets sold or transferred. The character of any gain or loss as capital or ordinary, and in the case of capital gain or loss, as short term or long term, will depend upon the nature of assets sold or transferred and the Debtors' holding period for the assets.

The discharge of a recourse debt obligation by a debtor for an amount of Cash and/or fair market value of property that is less than the adjusted issue price of the debt obligation (as determined for U.S. federal income tax purposes) gives rise to cancellation of indebtedness ("COD") income, which must be included in the debtor's income, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income (such as where the payment of the canceled debt would have given rise to a tax deduction). A specific statutory exception applies to certain debtors if the discharge of indebtedness is granted in a case under Title 11 of the United States Code (relating to bankruptcy) and pursuant to a plan approved by a bankruptcy court in such case. A separate exception applies to taxpayers if the discharge occurs when the taxpayer is insolvent.

To the extent that the consideration issued to holders of Claims pursuant to the Plan is attributable to accrued but unpaid interest, the Debtors should be entitled to interest deductions in the amount of such accrued interest, but only to the extent the Debtors have not already deducted such amount. The Debtors should not have COD income from the discharge of any accrued but unpaid interest pursuant to the Plan to the extent that the payment of such interest would have given rise to a deduction pursuant to Section 108e(2) of the Tax Code.

For the foregoing reasons, the precise amount of taxable gain or loss, COD income, or both, which the Debtors will realize as a result of effectuation of the Plan cannot be determined until the date of the sale, or transfer to the Liquidating Trust and the Litigation Trust.

     B.     <u>Tax Consequences to Creditors.</u>

The tax consequences of the implementation of the Plan and formation of the Liquidating Trust and the Litigation Trust to a creditor of the Debtors (a "<u>Creditor</u>") will depend on a number of factors, including the type of consideration received by the Creditor in exchange for its Claim, whether the Creditor reports income on the accrual or cash basis, whether the Creditor receives consideration in more than one tax year of the Creditor, whether the Creditor is a resident of the United States and whether all consideration received by the Creditor is deemed to be received by that Creditor in an integrated transaction. The tax consequences of the receipt of Cash or property that is allocable to accrued interest are discussed below in the section entitled "Receipt of Interest."

     (a)     <u>Receipt of Cash and Other Property</u>

A Creditor who receives Cash and/or other property (including Liquidating Trust Assets deemed received as discussed below) in satisfaction of its Claim generally will recognize gain (or loss) on the exchange equal to the difference between the amount of any Cash and the fair market value of any property received (not allocable to interest) and the Creditor's tax basis in its Claim. The character of any gain or loss as capital or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including (i) the nature and origin of the Claim (e.g., Claims arising in the

ordinary course of a trade or business or made for investment purposes); (ii) the tax status of the holder of the Claim; (iii) whether the Claim is a capital asset in the hands of the holder; (iv) whether the Claim has been held by the holder for more than one year; (v) the extent to which the holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (vi) the extent to which the holder acquired the Claim at a market discount.  Creditors should consult their own tax advisors regarding the amount and character of gain or loss, if any, to be recognized by them under the Plan.

> (b)   <u>Receipt of Interest</u>

Consideration received by a Creditor that is attributable to accrued interest not previously included in taxable income should be treated as ordinary income, regardless of whether the Creditor's existing Claims are capital.  Conversely, a holder of a Claim may be able to recognize a deductible loss (or possibly a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Claim was previously included in the holder's gross income but was not paid in full by the Debtors.  The extent to which the consideration received by a holder of a Claim will be attributable to accrued interest is unclear.

> (c)   <u>Market Discount</u>

The Tax Code generally requires holders of debt instruments with "market discount" to treat as ordinary income any gain realized on the disposition of such debt instruments to the extent of the market discount accrued during the holder's period of ownership. "Market discount" generally means the amount by which the "adjusted issue price" of a debt instrument (i.e., the sum of its issue price plus any accrued original issue discount) exceeds the holder's adjusted tax basis in such debt instrument.  Holders should consult their own tax advisors as to the potential application of the market discount rules to them in light of their individual circumstances.

> (d)   <u>Backup Withholding</u>

Under the Tax Code, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding," currently at a 28% rate. Backup withholding may apply to payments made pursuant to the Plan, unless you provide to the applicable withholding agent your taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establish an exemption from backup withholding.  Backup withholding is not an additional tax.  Any amount withheld under the backup withholding rules is allowable as a credit against your U.S. federal income tax liability, if any, and a refund may be obtained from the IRS if the amounts withheld exceed your actual U.S. federal income tax liability and you timely provide the required information or appropriate claim from to the IRS.

> C.   **U.S. Federal Income Tax Consequences of the Liquidating Trust**

> (a)   <u>Classification of the Liquidating Trust and the Litigation Trust</u>

The Liquidating Trust and the Litigation Trust (collectively, the "Trusts") will be organized for the primary purpose of liquidating the respective assets transferred to them

with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating purpose. Thus, the Trusts are intended to be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d). Under the Plan, all relevant parties are required to treat the Trusts as liquidating trusts, subject to definitive guidance to the contrary from the IRS. In general, a liquidating trust is not a separate taxable entity but rather is treated as a grantor trust, pursuant to sections 671 et seq. of the Tax Code, owned by the grantors of the trust. For this purpose, the beneficiaries of a liquidating trust are treated as the grantors of the trust.

Although the Trusts have been structured with the intention of complying with guidelines established by the IRS in Rev. Proc. 94-45, 1994-2 C.B. 684, for the formation of liquidating trusts, it is possible that the IRS could require a different characterization of the Trusts, which could result in a different and possibly greater tax liability to the Trusts or the holders of the beneficial interests in the Trusts. No request for a ruling from the IRS will be sought on the classification of the Trusts, and there can be no assurance that the IRS will not take a contrary position to the classification of the Trusts. If the IRS were to successfully challenge the classification of the Trusts as a grantor trusts, the U.S. federal income tax consequences to the Trusts and the holders of the beneficial interests in the Trusts could be materially different from those discussed herein. The following discussion assumes treatment of the Trusts as a grantor trusts for U.S. federal income tax purposes.

      (b)    Creation of the Liquidating Trust

If the Trusts are treated as "liquidating trusts" then, upon its creation, each beneficiary of the Trusts would be treated as having received and as owning an undivided interest in the assets of the Trusts in exchange for surrendering all or a portion of such beneficiary's Claim followed by a transfer by the beneficiary of such assets to the respective Trusts. Under the Plan, all parties (including, without limitation, the Debtors, the respective Trustees, the Trusts and the beneficiaries) are required to report consistently with the foregoing for federal and applicable state and local income tax purposes. The basis of such beneficiary's interest in the Trusts assets received will be equal to its fair market value as of the Effective Date. The fair market value of the portion of the Trusts that is treated as having been transferred to each beneficiary will be determined by the respective Trustees, and all parties must utilize such fair market values determined by the Trustees for U.S. federal and applicable state and local income tax purposes. The determination of the fair market value of a Claim holder's interest in the assets of the Trusts is factual in nature and the IRS may challenge any such determination.

      (c)    Allocation of Income and Loss and Disposition of Liquidating Trust Assets

Each holder of a beneficial interest in the Trusts must report on its U.S. federal income tax return its allocable share of income, gain, loss, deduction and credit recognized or incurred by the respective Trusts. Deductions attributable to activities and administrative expenses of the Trusts may be subject to limitation in the hands of the holders of the beneficial interest holders. Upon the sale or other disposition of any assets of the Trusts, each holder of a beneficial interest must report on its U.S. federal income tax return its share of

any gain or loss measured by the difference between (i) its share of the amount of Cash and/or the fair market value of any property received by the Trusts in exchange for the assets so sold or otherwise disposed of, and (ii) such holder's adjusted tax basis in its share of such asset.  The character of any such gain or loss to any such holder will be determined as if such holder itself had directly sold or otherwise disposed of such asset.  The character of items of income, gain, loss, deduction and credit to any holder of a beneficial interest, and the ability of such holder to benefit from any deductions or losses, will depend on the particular circumstances or status of any such holder.

As noted above, each holder of a beneficial interest in the Trusts has an obligation to report its share of the respective Trust's tax items (including gain on the sale or other disposition of a Trust asset).  Accordingly, holders of a beneficial interest may incur a tax liability as a result of owning a beneficial interest in the Trusts, regardless of whether the Trusts distribute Cash or other assets.  Due to the Trusts' requirements to satisfy certain liabilities, and due to possible differences in the timing of income on, and the receipt of Cash from, the assets of the Trusts, a holder of a beneficial interest may, in certain years, be required to report and pay tax on a greater amount of income than the amount of Cash received from the Trusts by such holder in such year.

## V.   **CONFIRMATION**

A.   <u>Confirmation Hearing.</u>

Section 1128 of the Bankruptcy Code requires the Court, after notice, to hold a Confirmation Hearing on the Plan at which time any party in interest may be heard in support of or in opposition to Confirmation. The Confirmation Hearing may be adjourned from time-to-time without further notice except for an announcement to be made at the Confirmation Hearing. Any objection to Confirmation must be made in writing and filed with the Clerk, and delivered to the following persons, at least seven (7) days prior to the Confirmation Hearing:

Counsel for Debtor:

BAKER & HOSTETLER LLP

Elizabeth A. Green, Esq.
Fed ID No. 903144
Email: egreen@bakerlaw.com
Jimmy D. Parrish, Esq.
Fed. ID No. 2687598
Email: jparrish@bakerlaw.com
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL 32801-3432

Telephone: (407) 649-4000
Facsimile:  (407) 841-0168

Jorian L. Rose, Esq.
(*admitted pro hac vice* 9/02/2015)
Email: jrose@bakerlaw.com
45 Rockefeller Plaza
New York, New York
Telephone: (212) 589-4200
Facsimile:  (212) 589-4201
*Counsel for Debtor*

And

United States Trustee:

Attn:  Ellen Maresh Hickman & Diane G. Livingstone
515 Rusk Ave, Suite 3516
Houston, Texas 77002

B.      Financial Information Relevant to Confirmation

The Debtor has evaluated several alternatives to the Plan.  At this stage of the

Debtor's case, if no Chapter 11 plan can be confirmed, it is anticipated that the Bankruptcy Case

would be converted to a case under Chapter 7 of the Bankruptcy Code, in which event a trustee

would be elected or appointed to liquidate the Debtor's assets for distribution to creditors in

accordance with the priorities established by the Bankruptcy Code.  The Debtor believes that

liquidation under Chapter 7 would cause distributions to be significantly reduced because of the

increased costs and expenses of liquidation under chapter 7 arising from fees payable to a trustee

for bankruptcy and professional advisors to such trustee.  Accordingly, the Debtor submits that

Creditors of the Debtor will fair significantly better under the Plan than if the Debtor were forced

into liquidation under Chapter 7.

C.     Confirmation Standards.

For a plan of reorganization to be confirmed, the Bankruptcy Code requires, among other things, that a plan be proposed in good faith and comply with the applicable provisions of Chapter 11 of the Bankruptcy Code. Section 1129 of the Bankruptcy Code also imposes requirements that, among other things, at least one class of Impaired Claims accept a plan, that confirmation of a plan is not likely to be followed by the need for further financial reorganization, that a plan be in the best interests of creditors, and that a plan be fair and equitable with respect to each class of Claims or Interests which is Impaired under the plan.

The Bankruptcy Court shall confirm a plan only if it finds that all of the requirements enumerated in Section 1129 of the Bankruptcy Code have been met. The Debtor believes that the Plan satisfies all of the requirements for Confirmation.

1.     Best Interests Test.

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of an Allowed Claim or Interest of such Class either: (a) has accepted the Plan; or (b) will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtor was, on the Effective Date, liquidated under Chapter 7 of the Bankruptcy Code. Due to the increased costs that will result from the liquidation of the Debtor's assets under Chapter 7 of the Bankruptcy Code, the Debtor believes that the best interests test is satisfied under the circumstances.

To determine what holders of Claims and Interests would receive if the Debtor was liquidated, the Court must determine how the assets and properties of the Debtor would be liquidated and distributed in the context of Chapter 7 liquidation cases.

37

The Debtor's cost of liquidation under Chapter 7 cases would include the fees payable to a trustee in bankruptcy and to any additional attorneys and other professionals engaged by such trustee and any unpaid expenses incurred by the Debtor during the Chapter 11 cases, including compensation of attorneys and accountants.  The additional costs and expenses incurred by a trustee in a Chapter 7 liquidation could be substantial and would decrease the possibility that Unsecured Creditors would receive meaningful distributions.  This is particularly the case where the Debtor is engaged or will engage in ongoing litigation with third parties.  The trustee and his professionals will need to review and analyze complex agreements and statutory provisions which would likely result in significant cost to the estate.  The foregoing types of Claims arising from Chapter 7 administration and such other Claims as may arise in Chapter 7 or result from the pending Chapter 11 cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay the Claims of Unsecured Creditors.  Additionally, liquidation in Chapter 7 might substantially delay the date at which Creditors would receive any payment.

The Debtor has carefully considered the probable effects of liquidation under Chapter 7 on the ultimate proceeds available for distribution to Creditors and holders of Interests, including the following:

a.    the possible costs and expenses of the Chapter 7 trustee or trustees and their professionals; and

b.    the possible substantial increase in Claims, which would have priority over or on parity with those of Unsecured Creditors.

After review of all of the above-referenced considerations, the Debtor believes that the best interests test is satisfied under the circumstances.

2.      Financial Feasibility.

The Bankruptcy Code requires, as a condition to Confirmation, that Confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor unless the liquidation is proposed in the Plan. The Debtor asserts that the Plan contemplates liquidation and therefore meets the feasibility requirement under the Bankruptcy Code.

3.      Acceptance by Impaired Classes.

The Bankruptcy Code requires as a condition to Confirmation that each Class of Claims or Interests that is Impaired under the Plan accept such plan, with the exception described in the following section. A Class of Claims has accepted the Plan if the Plan has been accepted by Creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class who vote to accept or to reject the Plan.

A Class of Interests has accepted the Plan if the Plan has been accepted by holders of Interests that hold at least two-thirds (2/3) in amount of the Allowed Interests of such Class that vote to accept or reject the Plan. Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.

A Class that is not Impaired under a Plan is deemed to have accepted such Plan; solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless: (i) the legal, equitable, and contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest are not modified; (ii) with respect to Secured Claims, the effect of any default is cured and the original terms of the obligation are reinstated; or (iii) the Plan provides that on the Effective Date the holder of the Claim or Interest receives on account of such claim or interest, Cash equal to the Allowed Amount of such Claim or, with respect to any Interest, any fixed liquidation preference to which the holder is entitled.

39

3.     <u>Confirmation Without Acceptance by all Impaired Classes: "Cramdown."</u>

The Bankruptcy Code contains provisions that enable the Bankruptcy Court to confirm the Plan, even though all Impaired Classes have not accepted the Plan, provided that the Plan has been accepted by at least one Impaired Class of Claims. Section 1129(b)(1) of the Bankruptcy Code states:

> "Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

This section makes clear that the Plan may be confirmed, notwithstanding the failure of an Impaired Class to accept the Plan, so long as the Plan does not discriminate unfairly and it is fair and equitable with respect to each Class of Claims that is Impaired under and has not accepted the Plan.

**THE DEBTOR BELIEVES THEY ARE ABLE TO MEET THE STATUTORY STANDARDS SET FORTH IN THE BANKRUPTCY CODE WITH RESPECT TO NONCONSENSUAL CONFIRMATION OF THE PLAN AND WILL SEEK SUCH RELIEF IF NECESSARY.**

D.     <u>Consummation.</u>

The Plan will be consummated and Payments made if the Plan is confirmed pursuant to a Final Order of the Bankruptcy Court and distributions under the Plan commence. It will not be necessary for the Debtor to await any required regulatory approvals from agencies or departments of the United States to consummate the Plan. The Plan will be implemented pursuant to its provisions and the Bankruptcy Code.

E.       Effects of Confirmation.

      1.       Authority to Effectuate the Plan

      Upon the entry of the Confirmation Order by the Bankruptcy Court, the Plan provides that all matters provided under the Plan will be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Debtor shall be authorized, without further application for an order of the Bankruptcy Court, to take whatever action is necessary to achieve consummation and carry out the Plan in accordance with the Plan and the Bankruptcy Code.

      2.       Binding Effect of Confirmation

      Confirmation of the Plan will legally bind the Debtor, all Creditors, Interest Holders, and other parties in interest to the provisions of the Plan whether or not the Claim or Interest Holder is impaired under the Plan and whether or not such Creditor or Interest Holder voted to accept the Plan.

      3.       Exculpation, Limited Liability and Release by the Debtor.

      ***Neither the Debtor, the Creditors' Committee, the Indenture Trustee, the Holders of Senior Notes, the DIP Agent, the DIP Lenders, nor any of their respective members, officers, directors, employees, advisors, professionals, independent contractors or agents (collectively, "Exculpation and Released Parties") shall have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, related to, or arising out of the Bankruptcy Case, negotiations regarding or concerning the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Exculpation and Released Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.***

41

*Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, for the good and valuable consideration provided by each of the Exculpation and Released Parties the adequacy of which is hereby confirmed, the Exculpation and Released Parties are deemed released and discharged by the Debtor and its Estate from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtor, its Estate, or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's restructuring, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Exculpation and Released Parties, the restructuring of claims and interests prior to or during this Chapter 11 Case, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or any related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of the Exculpation and Released Parties that constitutes actual fraud, willful misconduct, or gross negligence, provided, however, nothing in this section or the Plan shall release, waive or otherwise serve as a defense for Platinum or any director, officer, employee, control person or insiders (an insider as defined under the Bankruptcy Code) of Platinum.*

*Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.*

*Nothing contained in this Plan shall operate as a release, waiver, or discharge of any Claim, Cause of Action, right or other liability against members of the Creditors' Committee in any capacity other than as a member of the Creditors' Committee.*

## VI.    ALTERNATIVE TO THE PLAN.

If the Plan is not confirmed and consummated, the Debtor believes that the most likely alternative is liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.  The Debtor believes that this alternative is a much less attractive to Creditors than the Plan because of the increased administrative expenses with no additional return to Creditors.

## VII.    CONCLUSION.

The Debtor recommends that Holders of Claims entitled to vote on the Plan vote to accept the Plan.

608694464.1

Dated:  April 12, 2016
        Houston, Texas

Respectfully submitted,

**BAKER & HOSTETLER, LLP**

*/s/ Elizabeth A. Green*
_____

Elizabeth A. Green, Esq.
Fed ID No. 903144
Email: egreen@bakerlaw.com
Jimmy D. Parrish, Esq.
Fed. ID No. 2687598
Email: jparrish@bakerlaw.com
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL 32801-3432
Telephone: (407) 649-4000
Facsimile:  (407) 841-0168

Pamela Gale Johnson
State Bar No. 10777700
Fed ID No. 4481
811 Main Street, Suite 1100
Houston, Texas 77002-6111
Telephone:  (713) 646-1324
Facsimile:   (713) 751-1717
E-mail:  pjohnson@bakerlaw.com

Jorian L. Rose, Esq.
(*admitted pro hac vice* 9/02/2015)
Email: jrose@bakerlaw.com
45 Rockefeller Plaza
New York, New York
Telephone: (212) 589-4200
Facsimile:  (212) 589-4201

*Counsel for Debtor*

608694464.1