United States Bankruptcy Court
Southern District of Texas
**ENTERED**
December 28, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 15-34287 |
| BLACK ELK ENERGY OFFSHORE | § | |
| OPERATIONS, LLC, *et al.*, | § | CHAPTER 11 |
| | § | |
| Debtors. | § | |
| | § | |
| RICHARD SCHMIDT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 19-3370 |
| | § | |
| BARBARA NORDLICHT, AS LEGAL | § | |
| REPRESENTATIVE OF THE ESTATE OF | § | |
| JULES NORDLICHT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

Certain "Exchange Defendants" moved for summary judgment against the Black Elk Litigation Trustee. The Trustee alleges that the Exchange Defendants are transferees of fraudulently obtained funds. The Exchange Defendants contend that they cannot be transferees because they did not receive nor have control over the funds at the time of the transfer. Because genuine issues of material fact exist, summary judgment is denied.

### BACKGROUND

On September 16, 2019, Trustee Richard Schmidt of the Black Elk Litigation Trust filed a complaint against various defendants, including Adela Katz, Sanz Community Institutions, Golda Wilk, David and Ora Gichtin, and Abraham Grossman (the "Exchange Defendants").[1]  (ECF No. 85

---

[1] The Court consolidated the complaints against Katz and Sanz into this adversary proceeding on March 23, 2022.  (ECF No. 180).

1 / 12

at 5; Case No. 19-03550, ECF No. 1 at 4; Case No. 19-03459, ECF No. 1 at 4). The Trustee alleges that the Exchange Defendants were investors in Platinum Partners Black Elk Opportunities Fund LLC and Platinum Partners Black Elk Opportunities Fund International Ltd. ("PPBE") and are transferees of the fraudulently obtained funds. (ECF No. 85 at 5).

The parties do not dispute the facts of Platinum Partners' looting of Black Elk Energy Offshore Operations, LLC. Under Platinum's control, Black Elk fraudulently transferred proceeds from a sale of substantially all of its assets (the "Renaissance Sale") to various Platinum investment funds beginning on August 18, 2014. (ECF No. 85 at 83). Those funds then transferred the proceeds to PPBE on August 20 and 21, 2014. (ECF No. 85 at 84). PPBE issued equity redemptions to its investors with the fraudulently obtained funds on August 21, 2014. (ECF No. 85 at 84).

As investors in PPBE, the Trustee alleges that the Exchange Defendants (and others) are "the intended recipients of the Black Elk wire transfers, and thus treated as and may be liable as an initial transferee [under 11 U.S.C. § 550]. In the alternative, Defendants are liable as a subsequent or mediate transferee." (ECF No. 85 at 91).

The Exchange Defendants moved for summary judgment on the grounds that they exchanged their PPBE interests for interests in other Platinum funds—PPVA and PPCO—prior to the August 21, 2014 equity redemptions. (ECF No. 187 at 5–6). Platinum contacted PPBE investors in early August 2014 to ask if they wanted to exchange their interests in PPBE for PPVA or PPCO. (ECF No. 187 at 9). The Exchange Defendants differ from the other defendants in that they elected to exchange their interests and believe they did so prior to August 21, 2014. (ECF No. 187 at 9).

To complete the swap, the Exchange Defendants submitted Subscription Agreements in which they assigned and transferred to PPVA or PPCO all rights, titles, and interests in PPBE effective August 1, 2014. (ECF No. 187 at 10; *see, e.g.*, 187-2 at 4). The parties agree that Exchange Defendants' offers to exchange their interests in PPBE were irrevocable once made. (ECF Nos. 187-2 at 48; 221 at 5; 252

at 60). Wilk, Katz, Sanz, and Grossman subscribed to PPVA and the Gichtins subscribed to PPCO. (ECF Nos. 187 at 7–9; 187-2 at 4, 7, 34–36; 66; 187-3 at 27). The Subscription Agreements contain sections stating whether the subscription was accepted, accepted in part, or rejected. (ECF Nos. 187-2 at 5, 8, 34, 66; 187-3 at 28). These sections are blank in the Subscription Agreements the Exchange Defendants submitted. (*See* ECF Nos. 187-2 at 5, 8, 34, 66; 187-3 at 28).

The additional Subscription Agreements to PPVA state that the representations contained in the original Subscription Agreement to PPVA are restated. (*See, e.g.*, ECF No. 187-2 at 4, 7). In the original Subscription Agreement for PPVA, the subscriber must attest that he or she "[u]nderstands that this subscription is subject to allocation and acceptance or rejection by the Fund, in whole or in part, in its sole discretion; and . . . agrees that, if the Fund accepts this subscription, the Subscriber shall be bound . . . ." (ECF No. 187-2 at 13). The PPVA Subscription Agreements also indicate that the investor would wire the subscription amount to PPVA. (*See* ECF Nos. 187-2 at 4, 7, 12, 36; 187-3 at 27).

PPCO's Subscription Agreement likewise indicates that PPCO must accept the subscription: "Managing Member will advise Subscriber as soon as practicable whether this Subscription Agreement, together with all or a portion of the subscription, has been accepted or rejected and that any subscriptions may be rejected in whole or in part by the Managing Member in its sole and absolute discretion." (ECF No. 187-2 at 48). Like the PPVA subscriptions, the PPCO Subscription Agreement directs the investor to "wire transfer Subscription Amount to: [Platinum bank information]" and states that payment is due "at the same time as your Subscription Documents." (ECF No. 187-2 at 47, 64).

The Trustee alleges that it was Platinum's practice to communicate acceptance of subscription offers to its fund administrator. (ECF No. 204 at 24; *see, e.g.*, ECF Nos. 204-2 at 1; 204-40 at 1). Platinum sent its acceptance of the Gichtins' subscription offer to the fund administrator on August 18,

2014, and Platinum records reflect that PPBE made a transfer to PPCO on the Gichtins' behalf on August 21, 2014.  (ECF No. 204-10 at 1, 12; 204-38 at 3).  Platinum records also reflect that the remaining Exchange Defendants' subscriptions were officially accepted in September 2014.  (ECF Nos. 204-18 at 12; 204-19 at 22, 34, 37).

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. § 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(H).  Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine dispute of material fact means that evidence is such that a reasonable fact finder "could return a verdict for the nonmoving party."  *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  It is the movant's burden to establish that no genuine issue of material fact exists. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (citing *Condrey v. SunTrust Bank of Ga.,* 429 F.3d 556, 562 (5th Cir. 2005)).  A party asserting that a fact cannot be or is not genuinely disputed must support that assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact. FED. R. CIV. P. 56(c)(1).  If the movant establishes "the absence of evidence supporting an essential element of the non-movant's case," the burden shifts to the non-movant to establish a genuine dispute of material fact.  *Sossamon*, 560 F.3d at 326 (citing *Condrey*, 429 F.3d at 562).

In ruling on a motion for summary judgment, a court should view the facts and evidence in light most favorable to the non-moving party. *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014). Nevertheless, the court is not obligated to search the record for the non-moving party's evidence. *Keen v. Miller Env't. Grp., Inc.*, 702 F.3d 239, 249 (5th Cir. 2012). "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015). The Court need only consider the cited materials, but it may consider other materials in the record. FED. R. CIV. P. 56(c)(3). The Court should not weigh the evidence. *Aubrey v. Sch. Bd. of Lafayette Par.*, 92 F.3d 316, 318 (5th Cir. 1996). A credibility determination may not be part of the summary judgment analysis. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).

## ANALYSIS

The Exchange Defendants argue that they entered into contracts with PPVA and PPCO prior to August 21, 2014 and the irrevocable Subscription Agreements assigned all interests in PPBE equity to PPVA and PPCO prior to August 21, 2014. Thus, they cannot be liable as transferees when they did not receive, and lacked dominion and control over, the equity redemptions. (ECF Nos. 187 at 14; 221 at 6, 15). The Exchange Defendants do not meet their burden to establish the absence of a genuine dispute of material fact.

I. **CONTRACT FORMATION**

The Exchange Defendants contend that the proper inquiry is "whether parties have manifested an intent to be bound by the terms of a contract" under Delaware and Cayman law. (ECF No. 221 at 6–7). Assuming Delaware and Cayman law apply, there is still a factual dispute as to whether the PPVA and PPCO manifested an intent to be bound by the terms of the Subscription Agreements.

The Exchange Defendants cite to *Eagle Force Holdings LLC v. Campbell* for the proposition that under Delaware law, "a valid contract exists when (1) the parties intended that the instrument would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." 187 A.3d 1209, 1212–13 (Del. 2018) (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158–59 (Del. 2010)). Under the first element, words and actions may evidence an intent to be bound. *Id.* at 1229–30 ("[I]n applying this objective test for determining whether the parties intended to be bound, the court reviews the evidence that the parties communicated to each other up until the time that the contract was signed—i.e., their words and actions—including the putative contract itself." (citing *Black Horse Capital, LP v. Xstelos Holdings, Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014))).

Whether a party manifests an intent to be bound is a question of fact. *Id.* at 1213. The Court's determination of whether the parties manifested an intent to be bound is "based upon [the parties'] expressed words and deeds as manifested at the time rather than by their after-the-fact professed subjective intent." *UBEO Holdings, LLC v. Drakulic*, No. CV 2020-0669-KSJM, 2021 WL 1716966, at *9 (Del. Ch. Apr. 30, 2021) (citing *Kotler v. Shipman Assocs., LLC*, 2019 WL 4025634, at *16 (Del. Ch. Aug. 21, 2019)). An offeree need not generally reply to an offer; silence and inaction are not construed as acceptance unless the offeree leads the offeror to conclude that he has accepted the offer through his conduct. *Corp. Serv. Co. v. Kroll Associates, Inc.*, No. CIV.A.99C-12-210-JRS, 2001 WL 755934, at *4 (Del. Super. Ct. June 15, 2001); *cf. Frazier v. Am. Airlines, Inc.*, 434 F. Supp. 2d 279, 290–91 (D. Del. 2006), *aff'd*, 229 Fed. Appx. 171 (3d Cir. 2007) ("In order to form a contract, the recipient of an offer must communicate his or her acceptance of the offer to the offeror. 'An offer can be accepted by the rendering of a performance only if the offer invites such an acceptance.'" (citing *Restatement (Second) of Contracts* § 53(1))).

However, "[w]here an offeror requests an act in return for his promise and the act is performed, the act performed becomes the requisite overt manifestation of assent if the act is done intentionally; i.e., if there is a 'conscious will' to do it." *Indus. Am., Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del. 1971).

The Exchange Defendants argue that Platinum's early August 2014 solicitations to exchange their PPBE interests for interests in PPVA and PPCO should be construed as offers and the Subscription Agreements as acceptances of those offers: "Platinum is fairly construed as the offeror." (ECF No. 221 at 9). Despite the Exchange Defendants' exhortations, the Subscription Agreements plainly indicate that no contract will be formed until PPVA or PPCO accepts the Subscription Agreements. Each Subscription Agreement contains a section labeled "FOR USE BY THE FUND ONLY" indicating whether the subscription has been accepted, accepted in part, rejected, or other. (*See, e.g.*, ECF No. 187-2 at 5). It is difficult to construe the Subscription Agreements as offers sufficient to bind the Platinum funds when the Subscription Agreements require additional steps before the Platinum funds commit to the agreement.[2] At least one other court has found subscription agreements to be offers in similar circumstances:

> The Prospectus and subsequent Supplements make clear that Stratosphere was not undertaking a firm commitment to sell securities. At most, the Prospectus was a solicitation of offers, to be submitted in the form of subscription agreements. The Prospectus states that "there can be no assurance that if the Minimum Offering is achieved that any additional Units will be sold," and reserves the "right to withdraw or cancel such offer and to reject any subscription in whole or in part." The mutual assent and intent to be bound that are required for the formation of a contract to sell securities, therefore, is absent in this case.

*Cohen v. Stratosphere Corp.*, 115 F.3d 695, 701 (9th Cir. 1997).

---

[2] As stated by counsel for the Exchange Defendants, "[t]he case law is consistently clear that an irrevocable subscription is binding on the person or entity that made the subscription, whether or not ***the other side actually accepts the subscription to make a contract.***" (ECF No. 252 at 32) (emphasis added).

If the Court views the Subscription Agreements as offers, the Exchange Defendants argue that Platinum circulated records of which investors assented to a change of PPBE interests, which "leave[s] no question that Platinum considered itself bound by the exchange that it had offered to PPBE investors." (ECF No. 221 at 8). The Trustee argues that failure to meet the conditions of acceptance set forth in the Subscription Agreements constitutes a genuine dispute of material fact pertaining to contract formation. Indeed, Platinum records for the Exchange Defendants other than the Gichtins show confirmation letters sent in September 2014—well after the August 21, 2014 transfers. (ECF Nos. 204-18 at 12; 204-19 at 13, 22, 34, 37).

The Exchange Defendants also rely on the fact that PPBE sent the equity redemptions to PPVA and PPCO instead of the Exchange Defendants. This, the Exchange Defendants contend, is evidence that Platinum understood that the agreements were in effect. (ECF No. 221 at 11). This evidence is not sufficient for summary judgment; Platinum may have sent the funds to PPVA and PPCO because it intended to "accept" the Subscription Agreement sometime after the funds were in PPVA and PPCO, not before. It follows that Platinum may have endeavored to keep the financial risks with the PPBE investors until the transfers were complete: if the Renaissance Sale failed or the transfers were somehow disrupted, Platinum would not want its former PPBE investors to own PPVA and PPCO equity. The Court will not decide disputed fact questions on summary judgment—that task is appropriate following trial.

The Gichtins differ from the other Exchange Defendants in that a Platinum employee indicated on August 18, 2014 that the Gichtins would be transferring their interests to PPCO, and Platinum records indicate cash moved to PPCO on their account on August 21, 2014. (ECF Nos. 204-11 at 1; 204-38). Viewing the Subscription Agreement as an offer, the Gichtins offered to roll their PPBE investment of $500,000.00 over to PPCO. To accept, PPCO could either communicate

acceptance of the Subscription Agreement to the Gichtins or it could manifest of intent to be bound by the Subscription Agreement via performance.

The Trustee admits internal approval and confirmation of the Gichtins' transfer occurred before the wire transfer. (ECF No. 204 at 16). However, the evidence in the summary judgment record does not definitively demonstrate a manifestation of an intent to be bound before PPBE issued the equity redemption. While PPCO *internally* communicated an intent to accept the Gichtins' Subscription Agreement, the Court is not aware of words PPCO communicated to the Gichtins or actions it took which definitively demonstrate its intent to be bound before PPBE transferred Renaissance Sale proceeds. *See Eagle Force*, 187 A.3d at 1229–30 ("[T]he court reviews the evidence that the parties ***communicated to each other up*** until the time that the contract was signed—*i.e.*, their words and actions . . . .") (emphasis added); *Frazier*, 434 F. Supp. 2d at 290–91. The Trustee's allegation that PPCO held the funds from PPBE only as the Gichtins' agent survives; the Court cannot grant summary judgment with the evidence before it.

## II. DOMINION AND CONTROL

The parties do not dispute that the Subscription Agreements were irrevocable once made. (*See* ECF No. 252 at 60; *see, e.g.*, ECF No. 187-2 at 48). The Exchange Defendants assigned their "right, title, and interest of every kind" in PPBE. (*See, e.g.*, ECF No. 187-2 at 4). Because they did not have the requisite dominion and control over the PPBE equity redemptions that went to PPVA and PPCO, the Exchange Defendants argue that they cannot be "'transferee[s]' from whom the 'trustee may recover' under 11 U.S.C. § 550(a)" and "there is no basis for the Trustee to recover from the Exchange Defendants amounts that they did not receive." (ECF No. 187 at 6, 14).

Section 550 permits the Trustee to recover the property or value of property transferred and avoided under various sections of the Bankruptcy Code, including § 548.³ Under § 550, the Trustee may recover from "the initial transferee of such transfer or the entity for whose benefit such transfer was made" or "any immediate or mediate transferee of such initial transferee." Immediate or mediate transferees may defend against a § 550 action by showing they took "for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided . . . ." 11 U.S.C. § 550(b)(1). Initial transferees or the entity for whose benefit such transfer was made are not entitled to this defense. The Trustee alleges that the Exchange Defendants are "the intended recipients of the Black Elk wire transfers, and thus treated as and may be liable as an initial transferee. In the alternative, Defendants are liable as a subsequent or mediate transferee." (ECF No. 85 at 91).

To determine if a party is an initial transferee, the Fifth Circuit uses the dominion and control test. *Sec. First Nat'l Bank v. Brunson (In re Coutee)*, 984 F.2d 138, 140–41 (5th Cir. 1993) ("The Bankruptcy Code does not define 'initial transferee,' and this circuit has not articulated a definition. Other circuits that have, however, use a dominion or control test to determine whether a party is an initial transferee. . . . Adopting the dominion or control test, we find that . . . ."); *Whitlock v. Lowe (In re DeBerry)*, 945 F.3d 943, 946 (5th Cir. 2019) ("A bankruptcy trustee can recover from certain transferees. *See* 11 U.S.C. § 550(a). To recover, the bankruptcy trustee must show the alleged transferee had dominion and control over the transferred funds." (citing *Coutee*, 984 F.2d at 141)). In *Coutee*, the Fifth Circuit explained that "[d]ominion and control means legal dominion and control." 984 F.2d at 141 n.4. In the case of funds, it means "the right to put the

---

³ The complaint includes claims for avoidance of the transfers of the Renaissance Sale proceeds under § 548. (ECF No. 85 at 86–88).

money to one's own use." *Id.* (citing *Bonded Financial Services, Inc. v. European American Bank,* 838 F.2d 890 (7th Cir. 1988)) ("The law firm had no legal right to put the funds to its own use, and thus lacked the requisite dominion required to be the initial transferee."). When the intermediary does not have dominion and control, that party is a mere conduit or agent. *Id.* n.3; *see* 5 COLLIER ON BANKRUPTCY ¶ 550.01 (16th ed. 2022) ("[Section 550(a)] distinguishes between initial transferees and subsequent transferees. The Code does not define any of these terms, and many courts have ruled that a party acting merely as a conduit is not the *initial* transferee.") (emphasis added).

Before August 21, 2014, the Exchange Defendants asked the Platinum entities to exchange their interests in PPBE for interests in PPVA and PPCO in lieu of a redemption of PPBE equity. The Exchange Defendants were then unable to change their elections; neither PPVA nor PPCO rejected the Subscription Agreements prior to PPBE's equity redemption. Further, the Exchange Defendants did not receive funds from PPBE in their personal accounts; PPBE sent the funds to PPVA and PPCO.

The Trustee alleges that PPVA and PPCO did not gain control over the Exchange Defendants' PPBE equity interests prior to August 21, 2014. (ECF No. 204 at 23). When PPVA and PPCO received the PPBE equity redemption funds, they held the funds only as agents for the Exchange Defendants and accepted the Subscription Agreements later. If this factual scenario is proven at trial, the Exchange Defendants were transferees of the PPBE redemptions.

On summary judgment, the Court must make factual inferences in favor of the Trustee as the non-movant. *Plumhoff*, 572 U.S. at 768. As discussed above, whether PPVA and PPCO accepted the Subscription Agreements is unfit for summary judgment. Similarly, whether PPVA and PPCO held the funds as agents for the Exchange Defendants is unfit for summary judgment.

If the Court finds that the Exchange Defendants had no dominion and control, then they are not liable as initial transferees under § 550(a)(1). The Trustee alleges that the Exchange Defendants are also liable as subsequent or mediate transferees. (ECF No. 85 at 91). The Exchange Defendants' dominion and control argument does not assess whether they are potentially liable as subsequent or mediate transferees. Because the Exchange Defendant's motion for summary judgment seeks a ruling that "there is no basis for the Trustee to recover from the Exchange Defendants," the Court denies summary judgment.

## CONCLUSION

A separate order will be entered.

SIGNED 12/28/2022

_____
Marvin Isgur
United States Bankruptcy Judge